UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM GREG THOMAS,

     Petitioner,

v.                            CASE NO.  3:03-cv-237-J-32

WALTER A. MCNEIL, et al.,

     Respondents.

_____

MARK JAMES ASAY,

     Petitioner,

v.                            CASE NO.  3:05-cv-147-J-32

WALTER A. MCNEIL,

     Respondent.

_____

## ORDER[1]

    These are two of a trilogy of capital habeas cases which have raised difficult issues of whether the Petitioners' habeas petitions were timely filed. In Thomas v. McDonough, 452 F.Supp.2d 1203 (M.D. Fla. 2006), the Court ruled that two of the three cases were untimely. However, the Court later granted rehearing and held an

---

[1] Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically. However, it has been entered only to decide the motion or matter addressed herein and is not intended for official publication or to serve as precedent.

evidentiary hearing on all three cases regarding the issue of equitable tolling.  The Court then received guidance from the Eleventh Circuit, which decided <u>Downs v. McNeil</u>, 520 F.3d 1311 (11th Cir. 2008) and <u>Holland v. Florida</u>, 539 F.3d 1334 (11th Cir. 2008) (per curiam).  Based on <u>Downs</u> and <u>Holland</u>, the Court has now decided one of the trilogy, <u>Damren v. McNeil</u>, No. 3:03-cv-397-J-32, 2009 WL 129612 (M.D. Fla. Jan. 20, 2009), determining that petitioner Damren's habeas petition must be dismissed as untimely notwithstanding the gross negligence of his appointed lawyer in failing to file the petition on time.

The Court now turns to the remaining two cases, involving Petitioners Thomas and Asay,[2] and chooses to address them in one consolidated opinion pursuant to Rule 42(a), Federal Rules of Civil Procedure, because they each raise the same issue of equitable tolling based on the actions of the same attorney who represented both Petitioners.[3]

---

[2] The Court will refer to the document number in the particular case being addressed.

[3] Petitioners' current counsel in all three of these cases is John Mills, Esquire.  Mr. Mills had nothing to do with the original and untimely filing of these petitions, but rather was appointed by the Court to represent the Petitioners once the Court realized that the actions of predecessor counsel were being called into serious question.  The Court appreciates Mr. Mills' service in these cases.

## TIMELINESS (THOMAS)

Before addressing any issue of equitable tolling, the Court must first determine whether the habeas petitions were untimely under the one year limitation period contained in 28 U.S.C. § 2244(d).  In its original opinion in Petitioner Thomas' case, 452 F.Supp.2d at 1211-13, the Court calculated that Petitioner's federal petition was due to be filed by April 16, 2003.  However, after further investigation, both the state and Thomas agreed that the correct date is actually June 18, 2003[4] (Doc. #103 at 6); (Doc. #104 at 9).  Thomas' habeas petition was not filed until March 22, 2004; thus, it was untimely under the statute.  In the Court's previous opinion, 452 F.Supp.2d at 1212-18, the Court rejected a variety of arguments as to why this untimeliness should be excused.  The Court hereby reaffirms those rulings.  However, the Court was concerned whether the actions of Petitioner's federal habeas counsel in filing the petition late might constitute a basis for equitable tolling. The Court therefore conducted several hearings, appointed additional counsel, granted rehearing, and conducted an evidentiary hearing. The Court will address that issue in this opinion.

---

[4] The parties became aware of a <u>Ring v. Arizona</u>, 536 U.S. 584 (2002) motion filed in state court, not previously mentioned or presented to the Court in supporting documents.

## TIMELINESS (ASAY)

Unlike Petitioner Thomas, the Court has not previously addressed in detail the procedural history of Asay's case to determine whether his federal habeas petition was timely. Here is that history:

Petitioner was convicted of first degree murder and sentenced to death. On direct appeal, the Supreme Court of Florida affirmed the convictions and sentences.[5] _Asay v. State_, 580 So.2d 610 (Fla.), _cert_. _denied_, 502 U.S. 895 (1991); Ex. A.[6] Petitioner's conviction became final on October 7, 1991, when the United States Supreme Court denied certiorari. Ex. B. Since his conviction became final prior to AEDPA's effective date, the one-year limitation period began to run on April 24, 1996. _See_ _Guenther v. Holt_, 173 F.3d 1328, 1331 (11th Cir. 1999), _cert_. _denied_, 528 U.S. 1085 (2000). Thus, Petitioner should have filed this action on or before April 24, 1997, unless any periods of time can be excluded

---

[5] The facts underlying the judgment and sentences, as summarized by the Florida Supreme Court, are provided in the May 16, 1991 decision.

[6] The Exhibits were filed on September 2, 2005, as Respondent's Exhibits to Motion for Summary Judgment (Doc. #14). The Court will hereinafter refer to Respondent's Exhibits as "Ex." Additionally, the Court will hereinafter refer to the exhibits submitted at the evidentiary hearing by Petitioner Asay's surname and the tab number, _e.g.,_ Asay, Tab 1, or by referencing the particular Exhibit.

4

from this one-year grace period because Petitioner was pursuing a properly filed application for state post-conviction relief.

Petitioner filed his first Rule 3.850 post conviction motion on March 16, 1993.[7]  Thus, the federal limitation period was tolled from April 24, 1996, to December 1, 2000, when the Florida Supreme Court issued its mandate from the affirmance of the denial of post conviction relief.  Ex. D.  The limitation period ran for 327 days until Petitioner filed his state petition for writ of habeas corpus on October 25, 2001.  Petition (Doc. #8) at 4.  The petition was denied on June 13, 2002, Ex. E, and rehearing was denied on October 4, 2002.  Ex. F.  The limitation period ran for twelve days, until Petitioner filed his second Rule 3.850 motion on October 17, 2002. Petition (Doc. #8) at 5.  The second Rule 3.850 motion[8] tolled the limitation period until December 20, 2004, when the Supreme Court of Florida affirmed the denial of relief.  Ex. H.  At that point, twenty-six days remained in the one-year federal limitation period.

---

[7] Petitioner states that he filed the motion on March 15, 1993. Asay, Tab 14.  The Petition at 4 (Doc. #8) and the Supreme Court of Florida's Revised Opinion of June 29, 2000, state the motion was filed on March 16, 1993.  Ex. C at 4-5.

[8] The Court will assume for purposes of this opinion that the second Rule 3.850 was properly filed.  This should not serve as precedent for other proceedings.

5

Therefore, Petitioner should have filed his federal petition on or before Monday, January 17, 2005.[9]

Petitioner Asay initiated this action by filing a pro se letter (Doc. #1) (hereinafter Letter) on February 8, 2005, pursuant to the mailbox rule. In the Letter, he complains that his counsel, Dale G. Westling, Esquire, and Mary C. Bonner, Esquire, are ineffective and they failed to timely file a 2254 petition. Petitioner seeks equitable tolling and other relief from the Court. Petitioner's counsel were directed to respond to the Letter.

On March 7, 2005, Mr. Westling and Ms. Bonner filed a Response to This Court's Order of February 15, 2005 (Doc. #5) (hereinafter Response), stating:

> Mr. Asay is the victim of an overly technical system where the practicalities of review of records and appointment of federal counsel are in a state of flux. He is necessarily concerned and cautious. However, he has approximately five months' time in which to timely file his Motion to Vacate pursuant to Title 28 USC § 2254.
>
> Carey v. Saffold, 536 U.S. 214 (2002), permits Mr. Asay to file a timely Motion to Vacate if that Motion is filed within the next five months' time. Mr. Asay fears that Carey does not apply. A review will be undertaken herein to establish that the United States Supreme Court's holding is applicable in this case.

_____

[9] As noted by Respondent, the one-year period would have expired on January 15, 2005 (a Saturday), so Petitioner had until Monday, January 17, 2005, to file the petition.

6

Response at 1.

Thereafter, on August 15, 2005, Ms. Bonner filed a Petition for Writ of Habeas Corpus (Doc. #8) (hereinafter Petition), an Affidavit of Indigency (Doc. #9) and a Request for Nunc Pro Tunc Appointment as Counsel; Request for Leave to Supplement Form Provided for Motion to Vacate; Motion for Leave to File a Memorandum of Law in Support of Mr. Asay's Factual Presentation (Doc. #10).  Supplementary Affidavits to Mr. Asay's Motion to Vacate Conviction and Sentence (Doc. #12) were filed on August 22, 2005.

Thus, the petition was due by January 17, 2005, and was not filed until August 15, 2005; therefore, it is untimely.  Thus, unless equitable tolling applies, Petitioner's petition is due to be dismissed.

### THE LAW OF EQUITABLE TOLLING

Until recently, the Eleventh Circuit's decisions were evolving regarding the circumstances in which a habeas attorney's conduct might provide the basis for equitable tolling.  It has always been clear that equitable tolling will only apply in "extraordinary circumstances" and that the Eleventh Circuit "has rejected most claims for equitable tolling," especially in situations involving the negligence of the petitioner's attorney.  Diaz v. Sec'y for the Dep't of Corr., 362 F.3d 698, 700-701 (11th Cir. 2004) (per curiam).  However, the Eleventh Circuit had left open the door to equitable

tolling claims based on egregious attorney conduct.  See Powe v. Culliver, 205 Fed. Appx. 729, 731 (11th Cir. 2006) (per curiam) (not selected for publication in the Federal Reporter), cert. denied, 549 U.S. 1270 (2007).  Other circuits have likewise found equitable tolling to apply in cases of serious attorney misconduct.  See Fleming v. Evans, 481 F.3d 1249, 1256 (10th Cir. 2007); United States v. Martin, 408 F.3d 1089, 1093 (8th Cir. 2005); Baldayaque v. United States, 338 F.3d 145, 152 (2nd Cir. 2003); Spitsyn v. Moore, 345 F.3d 796, 801-802 (9th Cir. 2003); Brown v. Shannon, 322 F.3d 768, 773-74 (3d Cir. 2003); and United States v. Wynn, 292 F.3d 226, 230 (5th Cir. 2002).

In a recent pair of decisions, Downs and Holland, the Eleventh Circuit has now solidified the law in this area.[10]  In Downs, the Eleventh Circuit rejected the state's contention that attorney misconduct could never constitute extraordinary circumstances justifying equitable tolling, 520 F.3d at 1319-25.  Recognizing a split among the circuits, the Eleventh Circuit noted that it had not previously decided the issue.  Id. at 1319.  The Eleventh Circuit stated that "an attorney's ordinary negligence may be attributed to the client under general principles of agency[,]" but declined to

---

[10] Notably, the United States Supreme Court has never held that equitable tolling applies in federal habeas cases, though it has assumed arguendo that it does.  Lawrence v. Florida, 549 U.S. 327, 335-36 and n.3 (2007).

extend that principle to cases involving "egregious misconduct of postconviction counsel." <u>Id</u>. at 1320.  It pointed to case law holding that an agent does not bind his principal "when the agent is acting adversely to the principal's interests[,]" and it chose to follow those circuits that hold that "serious attorney misconduct may constitute an extraordinary circumstance for purposes of equitable tolling."  <u>Id</u>. at 1321.  The Eleventh Circuit noted that other circuits have recognized that equitable tolling could be appropriate "where the attorney has made misrepresentations to the client, disregarded the client's instructions, refused to return documents, or abandoned the client's case."  <u>Id</u>.  The Court determined that it would apply a "fact-specific, case-by-case approach."  <u>Id</u>. at 1322.  While remanding for an evidentiary hearing, the Court concluded that petitioner's allegations of the following conduct would support equitable tolling if proven:

> "[petitioner's] unequivocal, repeated demands
> that his attorneys file his habeas petition;
> his close tracking of his attorneys' work and
> the applicable federal deadlines; and his
> counsel's overt deception in representing they
> had filed a tolling petition in state court
> when they had not in fact done so[.]"

<u>Id</u>.

The Eleventh Circuit in <u>Downs</u>, also found that the petitioner had met the due diligence requirement for equitable tolling because he had written to his attorneys "to express concern over the running

of the AEDPA filing period and to urge the filing of his federal habeas petition" and he had "attempted to assist his attorneys in drafting his federal petition by providing them with either a draft petition or a list of issues to be included in the petition." Id. at 1323. The Court also found that "[e]vidence of [petitioner's] lawyers' untrustworthiness surfaced slowly and counsel's communications throughout the course of representation left it unclear whether and when counsel had drafted and filed [petitioner's] state and federal habeas petitions." Id. at 1324. Moreover, the Court noted that because petitioner was represented by counsel, any pro se petition he tried to file would be stricken under the Local Rules. Id. at 1324 and n.10. The Downs Court emphasized that while serious misconduct could justify equitable tolling, "ordinary attorney negligence[,]" such as miscalculating a deadline, failing to adequately raise a meritorious claim, or another run of the mill mistake, would not. Id. at 1325. Petitioner's case was exceptional because his counsel "allegedly lied to Downs on a matter of legal importance and evinced utter disregard for Downs' repeated directive to file his habeas petition." Id.

Finally, the Eleventh Circuit in Downs stated:

> In considering whether the conduct of counsel was extraordinary, we will not dissect the continuing course of conduct in which counsel engaged, but rather view counsel's behavior as

10

> a whole. Consequently, although the culminating event which rendered Downs' federal habeas petition untimely was counsel's late filing of the petition, that ordinary act of negligence cannot be isolated from counsel's allegedly egregious misconduct.

Id. at 1323.[11]

Shortly thereafter, the Eleventh Circuit decided Holland, in which it rejected a claim of equitable tolling based on attorney misconduct. The Eleventh Circuit declined to extend Downs to the facts of Holland's case stating, "[w]e are attempting to keep the exception for extraordinary circumstances from being the rule." Holland, 539 F.3d at 1339 n.10. In Holland, the Eleventh Circuit assumed petitioner Holland's lawyer was "negligent, even grossly negligent" but held that petitioner's equitable tolling claim failed because petitioner made "no allegation of knowing or reckless factual misrepresentation [by the lawyer] or of lawyer dishonesty. Instead, Petitioner's allegations are limited to [the lawyer's] failure to communicate with Petitioner on the status of his case and to [the lawyer's] failure to file a federal habeas petition timely, despite repeated instructions to do so." Id. at 1339.

_____

[11] The Eleventh Circuit also cited with approval Lonchar v. Thomas, 517 U.S. 314, 324 (1996) ("Dismissal of a first habeas petition is a particularly serious matter, for that dismissal denies the petitioner the protections of the Great Writ entirely, risking injury to an important interest in human liberty.") Id. at 1323.

In affirming dismissal of the petition, the <u>Holland</u> Court announced the following principle of law: "no allegation of lawyer negligence or failure to meet a lawyer's standard of care - in the absence of an allegation and proof of bad faith, dishonesty, divided loyalty, mental impairment or so forth on the lawyer's part - can rise to the level of egregious attorney misconduct that would entitle Petitioner to equitable tolling.  Pure professional negligence is not enough." <u>Id</u>.

This Court was concerned enough about Petitioners' counsel conduct to conduct an evidentiary hearing (as suggested by <u>Downs</u>).[12] Now, the Court will apply the facts as found to the principles set forth in <u>Downs</u> and <u>Holland</u>.  <u>See also</u> <u>Melson v. Allen</u>, 548 F.3d 993 (11th Cir. 2008).[13]

### EQUITABLE TOLLING AS TO THOMAS

The <u>Thomas</u> case first came to the Court's attention on March 24, 2003, when Petitioner Thomas, through counsel Mary Catherine Bonner, filed a "Motion for Appointment of Counsel Pursuant to 18 U.S.C. § 3001 et. seq. and 21 U.S.C. § 848 et. seq. for Representation in To-Be-Filed Federal Habeas Corpus Proceedings in

---

[12] <u>See</u> <u>also</u> <u>Hammond v. Frazier</u>, No. 07-10573, 2008 WL 1891478 (11th Cir. Apr. 30, 2008) (per curiam) (non-published) (remanding under <u>Downs</u> for the district court to conduct evidentiary hearing on equitable tolling claim based on alleged attorney misconduct).

[13] The Court is aided by supplemental briefs filed by the parties to address the facts of the case in light of <u>Downs</u> and <u>Holland</u>.

a Capital Case" (Doc. 1).[14]  The motion states that counsel was

contacted by Petitioner's state post-conviction counsel in February

2003, and due to the interaction of the time frames of the state and

federal litigation, the matter was of an urgent nature.  Thus, the

Court immediately conducted a hearing on March 26, 2003.  Ms. Bonner

appeared telephonically and requested immediate pre-petition

appointment so that she could timely prepare and file a habeas

petition.  Ms. Bonner stated her qualifications were that she was in

good standing with the Court since 1979, she practiced both before

the Eleventh Circuit and the United States Supreme Court, she

litigated both Section 2255 and 2254 actions, and she had

represented three people on death row in state capital cases.  The

Court, comforted that Ms. Bonner was experienced capital counsel,

stated that it would enter an order appointing her.  That Order was

filed April 2, 2003, nunc pro tunc to March 26, 2003.[15]  Based on Ms.

Bonner's statements of the urgent timing, the Court expected a

---

[14] Of course, the one year limitation period continues to run even
if a petitioner files a motion for appointment of counsel in federal
court until such time as a petition for writ of habeas corpus is
actually filed.  See Woodford v. Garceau, 538 U.S. 202, 208 (2003).
Thus, Ms. Bonner's filing of the motion for appointment of counsel
did not stop the limitations period from running.

[15] At the time it was assumed by Ms. Bonner that the petition was
due to be filed in April 2003.  Much later, the Court determined
that the petition was not actually due to be filed until June 18,
2003.

13

petition to be filed almost immediately.[16]   However, nothing happened.   Finally, on June 4, 2003, the Court entered an order requiring Petitioner to advise the Court, no later than June 17, 2003, of the status of the case.   Order (Doc. #5).   Ms. Bonner filed an Ex Parte Status Report[17] on June 12, 2003 (Sealed Document S-8). In the Report, counsel anticipated that investigation, research and drafting a petition would consume at least six more weeks.   On July 21, 2003, Ms. Bonner filed another Ex Parte Status Report stating she anticipated that investigation, research and drafting a petition would consume, at least, an additional six weeks.   (Sealed Document S-12).   Of course, by this time (unbeknownst to the Court) the June 18, 2003 limitation deadline had come and gone.

Seven months later, On February 19, 2004, having heard nothing from Ms. Bonner, the Court ordered Petitioner to advise the Court, no later than March 15, 2004, of the status of the case or face dismissal for failure to prosecute (Doc. #7).   On March 15, 2004, Ms. Bonner filed a status report and asked leave to file her habeas petition no later than March 19, 2004 (Doc. #8).   The Court entered

---

[16] As is typical, the Court was not independently knowledgeable as to the limitations deadline but was relying on Ms. Bonner's statement that time for filing a petition was short.

[17] The Court finds that the Ex Parte Status Reports mentioned are not the type of information that should remain confidential as it pertains to the timeliness issue.   Thus, the Court will unseal these documents (S-8 and S-12) and file them in the public docket.

an Order (Doc. #9), filed on March 18, 2004, stating that leave is not required to file a petition and that any determination as to the timeliness of the petition would be made after the filing of the petition and the response.  At long last, the petition (Doc. #12) was filed on March 22, 2004.  The Court ordered Respondents to file a limited response addressing the timeliness issue, which Respondents did (Doc. #15).

The Court conducted oral argument on the timeliness issue. (Doc. #38).  The essence of Ms. Bonner's position was that she had no explanation for why she filed the Petition untimely other than that she felt that she needed more time to investigate Petitioner's case before she filed a petition and that she intended to rely on equitable tolling as a basis to have her petition declared timely. Notably absent from Ms. Bonner's statement was whether she advised her client of her "strategy."  The Court was incredulous that a member of the Bar could deliberately let a statute of limitations expire, hoping later to convince the Court to apply equitable tolling.

Concerned, the Court appointed new co-counsel, John Mills (who has remained Petitioner's counsel since then), to further address the timeliness issue.  Ultimately, Mr. Mills persuaded the Court that before the Court made a final decision in these cases, it should conduct an evidentiary hearing.  In the meantime, the Court

15

conducted another motion hearing at which Ms. Bonner in part blamed the mental and physical health of her husband and herself as reasons for her actions.  Out of respect for Ms. Bonner's privacy, the Court will not repeat what she said on the record that day, but instead incorporates pages 79-82 of the transcript of the December 17, 2007 hearing.  (Doc. #63).

Both Ms. Bonner and Petitioner Thomas testified[18] at the evidentiary hearing held February 21, 2008.  While the transcript of that hearing will speak for itself (Doc. #84), the State's summary of this testimony contained in its supplemental brief is largely accurate:

> At the evidentiary hearing, Petitioner William Greg Thomas testified that his girlfriend, Ms. Sipple, sent a letter to Mary Katherine Bonner.  (T. 87, 89).  On January 6, 2003, Ms. Bonner sent an email back to Ms. Sipple.  (T. 89).  Ms. Bonner indicted [sic] that she would represent Thomas and was familiar with federal habeas.  (T. 92).  The email contained a discussion of the applicable time frames.  (T. 93, 94).  On January 21, 2003, approximately five months before Thomas' habeas petition was due on June 18, 2003, Ms. Bonner wrote him a letter.  (T. 95).  On January 30, 2003, Dale Westling, his state counsel, wrote Thomas a letter, saying that he was going to ask state court judge, Judge Wiggins, to appoint an attorney to handle his federal habeas.  (T. 96-97).  On March 3, 2003, over three months before Thomas' petition was due, Ms. Bonner wrote Thomas telling him that Dale Westling did not know when Thomas' habeas

---

[18] Thomas testified by video conference.

petition was due (T. 98). Ms. Bonner expressed
the intention of filing a petition for
certiorari in the United States Supreme Court
"to buy some time" to file the federal habeas
petition. (T. 98). Thomas was left with the
impression that Ms. Bonner knew what she was
talking about and his petition would be timely
filed. (T. 99). Ms. Bonner, in a letter to
Dale Westling referred to the prosecutor's
agreement not to assert any time bars but noted
that regardless of that agreement, many courts
explore their "own jurisdiction when neither
party wishes it." (T. 100). On March 10,
2003, over three months prior to Thomas' habeas
petition being due in federal court, state
counsel, Dale Westling wrote a letter to
Thomas, saying that the [sic] he filed a motion
for appointment of counsel in federal court but
that the judge declined to appoint Ms. Bonner
to represent him. (T. 101). On March 19,
2003, approximately three months prior to the
habeas petition being due, Ms. Bonner wrote a
letter to the clerk of this Court stating that
the time for Mr. Thomas to timely file his
federal habeas petition was running out. (T.
103). On March 19, 2003, approximately three
months prior to the habeas petition being due,
Ms. Bonner also wrote a letter to Thomas
explaining that the federal public defender had
advised her that her motion to be appointed as
habeas counsel would probably not be acted upon
quickly and advising Thomas to file the federal
habeas petition pro se. (T. 104). Ms. Bonner
enclosed a habeas petition for Thomas and
advised Thomas to copy the issues raised in his
state 3.850 motion and ask for leave to amend
after the appointment of counsel. (T. 105).
Thomas completed the habeas and sent it back to
Ms. Bonner to notarize and send to the court
per her instructions. (T. 105-106). The
handwritten date next to Thomas' signature on
the habeas petition, filed as Doc #12, was
April 4, 2003 which was over two months before
the habeas was due. (T. 106). On March 24,
2003, approximately three months prior to the
habeas petition being due, Ms. Bonner wrote a

17

letter to Thomas saying that she received a
call from prosecutor George Bateh informing her
that Mr. Westling was going to continue to
represent Thomas in federal court.   (T. 107).
On March 25, 2003, Mr. Westling wrote a letter
to Thomas.   (T. 107-108).   On March 26, 2003,
approximately three months prior to the habeas
petition being due, Ms. Bonner wrote a letter
to Thomas saying she was appointed today.   (T.
108-109).   On April 10, 2003, approximately two
months prior to the habeas petition being due,
Ms. Bonner wrote a letter to Thomas saying it
would be better to file a petition for writ of
certiorari in the Supreme Court than a habeas
petition in federal district court.   (T. 109-
110).   She wrote that she would continue to
prepare the § 2254 petition, so when the
certiorari petition was denied "we will be
ready to file virtually immediately."   (T.
110).   Thomas did not file the § 2254 petition
himself because he had no reason to believe the
[sic] Ms. Bonner was not handling it.   (T.
110).   Thomas explained that if you file a
petition yourself when you are represented by
counsel they reject it - you cannot file pro
se.   (T. 111).   On April 15, 2003,
approximately two months prior to the habeas
petition being due, Ms. Bonner wrote a letter
to Thomas stating that his time to file ran
before his 3.851 motion was filed in state
court "in that mess with counsel." (T. 111).
She stated that the first hurdle may be
timeliness and since it is already untimely,
she was going to "give it another week or so of
preparation time." (T. 111).  Thomas "figured"
Ms. Bonner had lied to him.  (T. 112).  On June
4, 2003, fourteen days prior to the deadline,
Ms. Bonner wrote a letter to Thomas stating
that she was working.  (T. 112-114).  On June
21, 2003, three days after the deadline had
passed, Ms. Bonner wrote a letter to Thomas
stating that the State had asserted that the
habeas petition was untimely.  (T. 114).  She
also wrote in this letter that the judge
granted her additional time until July 30th to
develop a constitutional attack which was

18

"incredibly good news" and she was laying the
groundwork for an attack on the AEDPA's time
limitation which would be a long road but "we
have to do it." (T. 115). On July 28, 2003,
ten days after the deadline had passed, Ms.
Bonner wrote a letter to Thomas stating the
dates under the AEDPA "were gone long ago" and
so she made the "considered decision" to file a
complete set of moving papers. (T. 115). On
August 27, 2003, approximately one month after
the deadline had passed, Ms. Bonner wrote a
letter to Thomas which included a § 2254
petition. (T. 116). Thomas did not know that
she had not filed the petition he sent her in
April of 2003. (T. 116). On cross, it became
clear that, when Thomas testified that Ms.
Bonner lied to him, he meant when she stated
his time had run before his state 3.851 was
filed. (T. 117-118). She was mistaken and
"something had to be wrong." (T. 122).

.   .   .   .

Mary Catherine Bonner testified. (T.
139). She had no idea why she came to the
conclusion that the time had run out. (T.
140). She believed that the filing of [a]
petition of writ of certiorari in the Supreme
Court from the state postconviction proceedings
tolled the time to file a habeas petition in
the district court. (T. 142). When asked why
she did not file the pro se petition signed by
Thomas on April 3, 2003, she testified there
was no such document. (T. 142-143). According
to Ms. Bonner, there was no document filled out
by Thomas that was sent to her. (T. 143). It
was her handwriting in the March 22, 2004
habeas that was filed. (T. 144). She had no
idea why the date of Thomas' signature was
April 3, 2003 and did not know if it was
accurate. (T. 144). Her files regarding the
Thomas case were destroyed by Hurricane Wilma
in 2005. (T. 147). Ms. Bonner adopted her
prior statements at the oral argument in
December 17, 2007, regarding her husband's
health. (T. 149, 154). Her family issues were

19

"very severe and very overwhelming." (T. 150).
Due to the "very difficult time." [sic] she
made mistakes. (T. 151). She testified that
she was aware of Coates v. Byrd, 211 F.3d 1225,
1227 (11th Cir. 2000) but that there was a
circuit split regarding the issue of whether a
petition for writ of certiorari from state
postconviction proceedings tolled the time to
file. (T. 153).

The court asked Ms. Bonner as an officer
of the court whether it was proper to miss a
deadline simply because there was more to do on
the pleading. (T. 155). She did not believe
that she could have filed a skeletal motion.
(T. 155). She believed that factual innocence
was at issue in the case. (T. 156). The court
noted that there was no claim of factual
innocence in the record but she explained that
she was exploring the issue. (T. 156). The
court noted that he had appointed Ms. Bonner on
an emergency basis because the time was running
out. (T. 156). The court asked why she had
moved for an emergency appointment and then not
filed the habeas petition on time and she
stated that she felt like developing certain
issues based on her conversation with Thomas.
(T. 156-157). She testified that she intended
to rely on equitable tolling to excuse the late
filing. (T. 157). Her own and her husband's
health situation was the reason for the late
filing. (T. 159).

Petitioner Thomas attempted to identify
the handwriting in the content section of the
habeas petition that was filed. (T. 160-161).
Thomas testified that a paralegal Eric Branch
filled out a habeas petition for him. (T.
161).

Supplemental Briefing Following Evidentiary Hearing (Doc. #104),

filed December 24, 2008, at 9-15 (footnotes omitted).

As instructed by the Eleventh Circuit in <u>Downs</u>, this Court must "view counsel's behavior as a whole." <u>Downs</u>, 520 F.3d at 1323. In hindsight, from the moment that Ms. Bonner filed her urgent application for appointment to be Petitioner's attorney, she has engaged in an egregious pattern of misfeasance. She has been grossly negligent to be sure, but it goes beyond that. Ms. Bonner, apparently deliberately, let the limitations period go by because she was not ready to file and felt that further investigation was required. Nevertheless, she wrote conflicting and inconsistent letters to Thomas about the deadline. She then submitted a habeas petition to Petitioner which he completed, signed and sent to her for filing on April 3, 2003, still well within the limitations deadline (Doc. #84 at 105-07, 160-62; Exhibit 11).[19]

On April 15, 2003, Ms. Bonner wrote Mr. Thomas, incorrectly telling him that his petition was already untimely but nevertheless giving him every reason to think that the petition would be filed in "another week or so . . . ." Exhibit 13, filed February 21, 2008. Mr. Thomas testified that he believed that Ms. Bonner had done what she promised and that he did not learn until 2006 that the petition had in fact not been filed at that time. Doc. #84 at 116-17, 127.

---

[19] The full copy of this petition could not be located and is not in the record. There is no dispute, however, that the petition appearing in the record as Petitioner's Exhibit 11 was signed on April 3, 2003 by Mr. Thomas, although it appears that Ms. Bonner had completed the rest of the form (Doc. #84 at 142-46, 160-62).

On June 4, 2003, the Court entered the following Order (Doc. 5):

> The Court has before it a proposed litigation budget for Court approval in a CJA voucher for appointment of an authority to pay court appointed counsel. The Court, however, is reluctant to take these requests under consideration without an actual petition before the Court. Accordingly, Petitioner shall advise the Court, no later than **June 17, 2003**, of the status of the case.

Ms. Bonner did file two "status reports," one in June and one in July saying she was working on the petition and she needed "at least six weeks additional time" to file the petition. However, these representations to the Court turned out to be untrue because no petition was filed.

Then, having heard nothing from Ms. Bonner for seven months, the Court on February 19, 2004, <u>sua</u> <u>sponte</u> entered the following Order (Doc. #7):

> Petitioner shall advise the Court, no later than March 15, 2004, of the status of the case. Failure to timely comply may result in dismissal of the case for failure to prosecute.

In response, Ms. Bonner finally was heard from again on March 15, 2004, filing a "status report" (Doc. #8) in which she stated that "Mr. Thomas apologizes for any lapse in providing status updates. At last Mr. Thomas has gathered virtually all the documentary and investigative materials required. He would ask that this Court grant him leave to file his Motion to Vacate no later than March 19,

22

2004."  The Court <u>sua</u> <u>sponte</u> entered an Order on March 18, 2004 (Doc. #9) advising Ms. Bonner that "leave is not required to file the petition for writ of habeas corpus" and that the Court will determine after the petition is filed whether it is timely. Finally, on March 22, 2004, almost a year to the day after Ms. Bonner had first requested this Court's appointment so that she could immediately file the petition, she in fact did so, missing the limitations deadline by over nine months.

This recitation reveals that Ms. Bonner's actions in securing an emergency appointment to represent Petitioner, in thereafter failing to file the petition in April 2003, after telling Petitioner she would do so, in thereafter willfully failing to file the petition even with the prodding of the Court and in willfully ignoring the importance of filing within the limitations period, sets her conduct above mere professional negligence, and rises to the level of bad faith.

Moreover, Ms. Bonner herself has tried to explain her misfeasance as being the product of mental impairment she suffered as a result of a serious injury and "very severe and very overwhelming" stress caused by her health issues and that of her spouse. (Doc. #84 at 149-50, 154, 159); <u>See also</u> December 17, 2007, Transcript (Doc. #63) at 79-82).  Of course, mental impairment is specifically mentioned in <u>Holland</u> as being one of the criteria which

"can rise to the level of egregious attorney misconduct that would entitle Petitioner to equitable tolling."  <u>Holland</u>, 539 F.3d at 1339.

In arguing against equitable tolling, the state, among other things, asked the Court to "consider the possibility that Mary Catherine Bonner missed the deadline in Thomas and Asay as part of a strategy to attack the AEDPA" (Doc. #104 at 16).  The state goes on to say how few habeas cases actually win on the merits so that "[w]hile normally missing the deadline to file an action necessarily would not be a wise litigation tactic, it certainly could be in the federal habeas context." <u>Id</u>. at 17.  Thus, the state concludes that "because relief on the merits is so unlikely, litigating equitable tolling could be more fruitful in terms of delay and be a reasonable tactic." <u>Id</u>. at 18.

If, as the state argues, Ms. Bonner missed the statute of limitations deadline on purpose, there is no evidence that she did so with the approval of her client.  Indeed, ultimately, it would be the client who would suffer from the missed deadline because his case would not be heard on the merits (however unlikely it is that the state thinks that he will ultimately prevail on the merits).  Thus, even if the state proved to be correct about Ms. Bonner's motivations, its argument would prove too much because the Eleventh Circuit in <u>Holland</u> lists "divided loyalty" as one of the criteria

24

which would justify equitable tolling based upon egregious attorney misconduct.    If, as the state suggests, Ms. Bonner, with calculation, but without consulting her client, chose to miss the statute of limitations deadline on purpose, she has rendered disloyal service to her client, not to mention to this Court, which appointed her to represent Petitioner at her urgent request.

Having lived with this case from the beginning and having now reviewed all of the evidentiary materials, judging the credibility of the witnesses and being informed by the law, the Court finds that Petitioner Thomas has shown by a preponderance of the evidence the type of extraordinary circumstances beyond his control envisioned by the Eleventh Circuit in <u>Downs</u> and <u>Holland</u> to justify equitable tolling based upon egregious attorney misconduct.

The Court also finds that Petitioner Thomas has been sufficiently diligent.  The record demonstrates that he was actively participating with his counsel, Ms. Bonner, and previous counsel, Mr. Westling, and took all reasonable steps to ensure the timeliness of his attempt to seek federal habeas review (See Doc. #84 at 88-117; Doc. #102).  Moreover, Petitioner submitted to Ms. Bonner a completed, signed habeas petition for filing on or about April 3, 2003.  By this time, the Court had appointed Ms. Bonner to represent him in this Court and any effort by Mr. Thomas to file the petition himself likely would have resulted in the petition being stricken.

25

See <u>Thomas</u>, 452 F.Supp.2d at 1206-1207, cited with approval in <u>Downs</u>, 520 F.3d at 1324 and n.10.  Moreover, Petitioner Thomas was deceived by Ms. Bonner, who both told him she was filing the petition in April 2003 when she in fact did not, and who kept advising him that his petition was already untimely when it was not. There was nothing more that Thomas could reasonably have been expected to do.

Selecting the period of equitable tolling is difficult. However, the Court determines equitable tolling began in April 2003 (about two months before the June 18, 2003 limitations deadline) when Petitioner had every right to assume that Mr. Bonner had filed his petition[20] until March 22, 2004 when the petition was filed. Thus, the petition filed by Mr. Thomas on March 22, 2004 is deemed timely.

### EQUITABLE TOLLING AS TO ASAY

Mr. Asay's habeas case also involves the failure of the same attorney, Mary Catherine Bonner, to file his petition on time.

The Court conducted an evidentiary hearing on February 21, 2008.  Petitioner Asay appeared by video-conference from the Florida Department of Corrections.  He was represented at the hearing by Mr.

---

[20] The Court notes that pursuant to standard practice, once Ms. Bonner was appointed to represent Mr. Thomas, all copies of orders and other pleadings filed in the case were sent only to Ms. Bonner and not to Mr. Thomas.  Thus, Petitioner was reliant on Ms. Bonner concerning the status of his case.

26

Mills.  Mr. Asay testified to the course of events leading up to the filing of his habeas petition.  A large number of documents were introduced supporting his rendition of the events.[21]  Of particular interest is the letter of July 1, 2002, from Heidi Brewer, his former Capital Collateral Regional Counsel (hereinafter CCRC), stating she was contemplating filing something in state court on the <u>Ring</u> issue, and meanwhile, she was working on the federal habeas corpus petition.  Asay, Tab 1.  Petitioner attested that he was aware that there was a federal time limitation and he knew that he needed to exhaust his state court remedies first.  Tr. at 26.

Petitioner received a communication from attorney Dale G. Westling, Sr., dated July 7, 2003, stating that he had been appointed to represent Petitioner in his Rule 3.850 procedure. Asay, Tab 2.  This occurred after the dismantling of CCRC North. Tr. at 27.  Petitioner wrote Mr. Westling concerning his qualifications.  Asay, Tab 3.  Petitioner was concerned about whether Mr. Westling could represent him in federal court.  Tr. at 29.  Mr. Westling responded and assured Petitioner that he had been a member of the Federal Bar for twenty-eight years.  <u>Id</u>. at 30; Asay, Tab 4.

---

[21] The Court accepts the redacted copies of the documents and will not require un-redacted copies of the documents to be submitted as they are not necessary for the purposes of this opinion.  <u>See</u> Tr. at 13-15.

Petitioner wrote a letter to Mr. Westling on July 21, 2003, informing him that, according to his former counsel, Ms. Brewer, his federal habeas petition will be due thirty days after the judge rules on the <u>Ring</u> issue. Asay, Tab 5. Petitioner attested that Ms. Brewer left him with a good understanding of his time limitations, independent of his own calculations. Tr. at 31. Mr. Westling wrote Petitioner on March 8, 2004, stating that he was attempting to contact Mary Catherine Bonner, a specialist in habeas proceedings. Asay, Tab 6.

Petitioner received a letter from Ms. Bonner, dated March 11, 2004, introducing herself. Asay, Tab 7. Petitioner understood that this was consistent with Mr. Westling's plan to bring her on board "so that she could begin to assimilate my case and begin to prepare for proceeding to federal court in a Rule 2254 petition." Tr. at 33. He also gleaned from the letter that Ms. Bonner was boasting of her federal court experience and her understanding of the rigid time limitations to proceed to federal court for death-sentenced inmates. <u>Id</u>. at 34-35.

On March 24, 2004, Mr. Westling wrote Petitioner a letter noting that Ms. Bonner was especially qualified to pursue time-barred proceedings in federal court. Asay, Tab 22. He added: "As you know, your time to file a habeas proceeding probably expired

some years ago."[22]  _Id_.  Petitioner did not recall receiving that letter.  Tr. at 36.

Petitioner filed Defendant['s] Pro Se Motion for a Status Hearing, dated April 15, 2004, Asay, Tab 8, in the circuit court because he was concerned that he was not receiving assurances from Mr. Westling or Ms. Bonner that they understood his federal time limitations.  Tr. at 37.  Petitioner understood that he had no more than thirty days, but perhaps as little as twenty-four days after issuance of the mandate from his second 3.850 motion to file his federal petition.  _Id_.  Petitioner requested a status conference in order to clarify the status of his federal time limitations because neither attorney appeared to understand the requirements of AEDPA and the impact on his case.  Asay, Tab 8.  Petitioner was concerned that neither attorney had actually determined the amount of time Petitioner had remaining on the limitation period.   Tr. at 37. Petitioner explained that he went to the circuit court because the circuit court had appointed Mr. Westling.  _Id_. at 37-38.

Petitioner received a letter from Mr. Westling dated April 23, 2004, where he provided some historical facts concerning Petitioner's case.  Asay, Tab 9.  Petitioner attested that the record was inaccurate because it failed to reference the state habeas and the motion for rehearing of the state habeas petition.

---

[22] This was incorrect.  _See_ pp. 4-6, _supra_.

29

Tr. at 38.  On April 27, 2004, Petitioner wrote Mr. Westling, noting that his *pro se* motion for a status hearing was returned by the circuit court unopened.  Asay, Tab 10.  Petitioner asked for the status of his federal habeas time limitations.  Id.  He also asked about any steps undertaken to perfect his federal habeas corpus in a timely manner.  Id.  Finally, he stated he would take precautionary steps to ensure that he did not end up procedurally barred through no fault of his own.  Id.  Petitioner decided his next step was to contact Mr. Roger Maas, the Executive Director of the Commission on Capital Cases.  Tr. at 41-42.

Mr. Westling wrote Ms. Bonner on May 3, 2004, asking her to respond to Petitioner's concerns about the federal habeas corpus time limitations.  Asay, Tab 21.  Petitioner did not remember receiving a copy of that letter.  Tr. at 42.

On August 6, 2004, the circuit court entered an Order Striking Defendant's *Pro Se* "Motion for a Status Hearing."  Asay, Tab 11.  The order stated Petitioner was represented by competent counsel, and the motion was not adopted by counsel.  Id.  Additionally, the circuit court entered an Addendum to Order Appointing Counsel, finding Mr. Westling meets the statutory requirements and the high ethical standards to represent someone sentenced to death.  Asay, Tab 12.

Petitioner attested that he received the Supreme Court of Florida's order, dated December 20, 2004, affirming the circuit court's order summarily denying his successive motion to vacate judgment and sentence under <u>Ring</u>.  Asay, Tab 13; Tr. at 45. Petitioner understood that the issuance of the mandate on this order would signify the restarting of his federal time limitations.  Tr. at 45.  Petitioner wrote Mr. Westling, on December 29, 2004, that his time was limited, and following mandate from the Supreme Court of Florida, he had as little as twenty-four days to process his federal petition.  Asay, Tab 14.  Petitioner provided his own calculations concerning the time remaining to timely file a petition for writ of habeas corpus in federal court.  <u>Id</u>.; Tr. at 46.  Petitioner also notified Roger Maas of his concerns by separate letter.  Asay, Tab 14, Tr. at 47-48.  Mr. Westling, on January 4, 2005, wrote Ms. Bonner concerning Petitioner's letter, asking her to call at her earliest convenience.  Asay, Tab 15.

On January 5, 2005, Roger Maas, the Executive Director of the Commission on Capital Cases, wrote Petitioner a letter in response to Petitioner's December 29, 2004 letter, explaining that Ms. Bonner had called him on January 4, 2005, she was aware of the issues Petitioner had raised, and she was giving them due consideration. Asay, Tab 16.

On January 12, 2005, Petitioner wrote Ms. Bonner (with copies to Mr. Westling and Mr. Maas), following up on a January 10, 2005 telephonic interview, and stated: "I am again instructing you to file my rule 2254 Petition in accordance with all Unite[d] States Supreme Court and Eleventh Circuit case law and applicable Antiterrorism and Effective Death Penalty Act legislation only." Asay, Tab 17.  Petitioner explained that it was during the January 10, 2005, interview that Ms. Bonner first referenced _Carey v. Saffold_.[23]  Tr. at 49.  During the interview, Petitioner said he wanted to stick with what they knew, and not to rely on _Carey_ because he was unsure of the implications of that case.  _Id_.  He did not want to risk relying on _Carey_ and he told Ms. Bonner to file his federal petition.  _Id_. at 50.

On January 25, 2005, Petitioner wrote Ms. Bonner stating he had received the copy of _Carey_ and that he did not consent to any delay in the filing of his 2254 petition based on _Carey_.  Asay, Tab 18. Petitioner directed Ms. Bonner to file within the twenty-four day time period.  _Id_.

Petitioner received a letter dated January 31, 2005, from the Office of the Clerk, Supreme Court of Florida.  Asay, Tab 19. Petitioner had written a letter to the Supreme Court of Florida Clerk asking to be informed when the mandate issued so he could keep

---

[23] _Carey v. Saffold_, 536 U.S. 214 (2002).

32

track of his remaining time under AEDPA.   Tr. at 52.   The Clerk responded:

> The Florida Supreme Court has received the following documents reflecting a filing date of 1/28/2005 - Letter dated 01/25/2005, by Marc Asay Re:  Mandate issuance.
>
> In response to the above letter, please be advised that this Court's Order dated December 20, 2004, is the final order.  No motion for rehearing was filed and this case is considered final in this Court.   No mandate will be issued.

Asay, Tab 19.

Petitioner wrote a letter to the Clerk of this Court dated February 8, 2005, chronicling the history of communications with his counsel and complaining that his attorneys failed to properly and timely file a 2254 petition.  Asay, Tab 20.  He asserted that they ignored his explicit instruction to timely file a petition.  Id.  He stated that they never disabused him of the notion that a mandate would issue on the denial of his second Rule 3.850 motion to restart the federal clock.  Id.  He said:  "Counsels['] negligence is more egregious because counsel did not even bother to convey to Asay that no USC Rule 2254 Petition would be filed, rather counsel led Asay to believe it would be done and done on time, and then simply abandoned Asay at this most critical juncture."  Id.

On March 7, 2005, in response to an order requiring counsel to respond to Asay's letter, Mr. Westling and Ms. Bonner advised the

Court that Mr. Asay was being "cautious" and that in fact he has "approximately five months' time [left] in which to timely file" his habeas petition.  (Doc. #5 at 1).[24]  This representation was patently incorrect; indeed, by March 2005, the deadline had already passed.

At the evidentiary hearing, Petitioner made the following argument:

> I'm alleging attorney misconduct.  I'm alleging that Ms. Bonner deliberately and willfully lied to me to keep me off balance so that I would not take protective action and file a Rule 2254 in my case.
>
> I believe it can be extrapolated from everything that I've done that if Ms. Bonner had have told me at any time that she was not going to file within this 24 days that me and her were talking about, that I would have got my pen and paper out and wrote to the court within that 24-day time frame.

Tr. at 53.

After Petitioner testified, the Court relieved Mr. Westling and Ms. Bonner as counsel for Petitioner in his federal proceedings. Tr. at 65-68.  Petitioner rested.  Id. at 68.  The Respondents called Mr. Westling and Ms. Bonner.  Mr. Westling testified that he was admitted to the Bar in 1975, worked for the State Attorney's Office for almost three years, and then went into private practice.

---

[24] On March 25, 2005, Petitioner filed another letter with the Court asking for "clarification" of whether his counsels' statements that Carey tolled the running of the limitations period was correct (Doc. #6).

<u>Id</u>. at 71.  He had been a member of the United States District Court, Middle District of Florida for twenty-eight years.  <u>Id</u>. at 72.

Mr. Westling testified that he brought Ms. Bonner into the case because she was involved in the <u>Ring</u> issue and she did a lot of federal habeas work.  <u>Id</u>. at 73.  Mr. Westling stated he never lied to Petitioner and never promised to file a federal habeas by a certain date.  <u>Id</u>. at 74.  He referred the federal habeas issue to Ms. Bonner and informed Petitioner that she was taking it over.  <u>Id</u>. Mr. Westling attested that he and Ms. Bonner discussed the timeliness issue many times, and Ms. Bonner felt comfortable with her interpretation of the law at the time.  <u>Id</u>. at 75.

Ms. Bonner attested that she did not lie to Mr. Asay.  Tr. at 81.  She explained her theory that the federal petition would be timely based on <u>Carey</u>:

> Well, I looked at the documents.  And I know that not everybody agrees with me here.  I looked at <u>Carey v. Saffold</u>.  And I was convinced that Florida had a system set up much like California's, where there was no time limit given on the filing of a habeas corpus for ineffective assistance of appellate counsel.
>
> Consequently, it looked like it, to me, that it was one long process.  And that is what I argued to -- to this court, that it was the -- those times were all removed from the calculations of the 2254.

Tr. at 81.

The state rested after Ms. Bonner's testimony.  Id. at 84.

The state contends that Ms. Bonner and her colleague Mr. Westling made no affirmative misrepresentation to Asay that they had filed his federal habeas petition when in fact they had not.  While this may be true, it does not fully capture the situation.  The evidence is clear that Mr. Asay assiduously stayed on top of his lawyers, repeatedly asking them to calculate his deadline to be sure his federal habeas petition was timely.  When they failed to do so, he complained to the state trial court and the state agency overseeing Capital Collateral Counsel (See Doc. #91 at 26-51; Exhibit 8 and Exhibit 14).  After calculating the deadline himself, Asay, on January 10, 2005, directly advised Ms. Bonner over the telephone to file his federal habeas petition within twenty-four days of the Supreme Court of Florida issuing its mandate, which he expected in January.  (Doc. #91 at 48-51).  He followed up two days later with a letter giving her the same unambiguous instruction (Exhibit 17).  (Had she done so before January 17, 2005, the petition would have been timely under any scenario).  On January 25, 2005, after receiving a copy of the U.S. Supreme Court decision that Ms. Bonner incorrectly told Asay provided for a later deadline, Asay instructed her not to rely on that case and stick to his earlier instruction (Exhibit 18).  He testified that if Ms. Bonner had told him she was not going to follow this direction, he would have filed

the petition himself.  (Doc. #91 at 55).  Indeed, on February 8,
2005, immediately after Asay realized that Ms. Bonner had not filed
his petition as instructed, he filed a Letter in this Court.

At the evidentiary hearing, the state asked Ms. Bonner only a
limited set of questions designed to show that she did not directly
"lie" to Asay.  But Ms. Bonner offered no testimony as to what she
told Mr. Assay in these phone conversations or in response to his
letters and made clear that while she was aware of the limitations
deadline, she deliberately chose to ignore it (without Asay's
consent and in the face of his protests) to try to rely on a new
theory of tolling which all objective observers, including the
state, believe has absolutely no merit whatsoever.  The terms "bad
faith" or "dishonesty" capture Ms. Bonner's conduct and are the type
of egregious conduct that rises well above professional negligence
or even gross negligence.  Combining this with Ms. Bonner's already
noted mental impairments during this time and giving some credence
to the state's view that Ms. Bonner deliberately chose to miss the
limitation deadline (even against her client's expressed wishes),
thereby creating "divided loyalty" between Mr. Asay and Ms. Bonner,
and even the high bar set by Holland is met.  Recognizing that
equitable tolling applies "only in truly extraordinary
circumstances" and "is typically applied sparingly," Johnson v.
United States, 340 F.3d 1219, 1266 (11th Cir. 2003) (citations

omitted), <u>aff'd</u>, 544 U.S. 295 (2005), the circumstances that this Petitioner has proven, which will hopefully be rare, meet this test. Moreover, it is hard to imagine how a Petitioner could be more diligent in the pursuit of a timely federal habeas filing.

The period of equitable tolling runs from at least January 10, 2005, when Petitioner unambiguously instructed Ms. Bonner to file his habeas petition, until the date of filing of the petition on August 15, 2005. Alternatively, the equitable tolling period runs from January 10, 2005, until February 8, 2005, when Petitioner, after realizing that Ms. Bonner had refused to file the petition on time, filed a letter which the state has referred to as a habeas petition.[25]

-------

[25] Another aspect of the equitable tolling analysis is the confusion over whether the Florida Supreme Court would issue a mandate following its December 20, 2004 denial of Asay's second Rule 3.850 motion based on <u>Ring v. Arizona</u>. <u>See</u> Docs. #40, #43, #68 & #65. Because a mandate had issued from the affirmance of the denial of Petitioner's first Rule 3.850 motion, Petitioner had reasonably assumed that a mandate would also issue following denial of the second motion. However, when one did not timely issue, Petitioner promptly wrote the Clerk of the Supreme Court of Florida who advised by letter dated January 31, 2005 that no mandate would be issued and that the December 20, 2004 Order was final. (Asay, Tab 19). Petitioner, realizing after receiving this letter from the Clerk that no mandate would issue, promptly filed his "letter petition" in this Court on February 8, 2005. Assuming that the Clerk's letter of January 31, 2005 notified Petitioner that the federal habeas clock was again running, Petitioner's filing of the letter on February 8th would be timely (assuming there were twenty-six days remaining in the one year period). Thus, because of the confusion regarding issuance of the mandate, which was not resolved until the January 31, 2005 letter issued by the Clerk of the Florida Supreme Court, Petitioner's February 8, 2005 letter is either timely under the

**CONCLUSION**

The Court is aware that the Eleventh Circuit has set a very high threshold to meet the requirements of equitable tolling based on a habeas petitioner's counsel's misfeasance.  In the first case of this unfortunate trilogy, <u>Damren</u>, the Court has concluded that equitable tolling was not appropriate, notwithstanding the gross negligence of petitioner's counsel.  However, acknowledging that the line between "gross negligence" and "bad faith" or "divided loyalty" is hard to draw, the Court concludes that <u>Thomas</u> and <u>Asay</u> are the rare cases where equitable tolling should be applied.[26] Nevertheless, recognizing that these cases have already taken too long to resolve and that the Eleventh Circuit, which reviews equitable tolling issues <u>de novo</u>, may have a different view, the Court will certify these cases for interlocutory appeal should the

_____

statute or equitable tolling should be applied to render it timely. At the very least, the time from the Florida Supreme Court's December 20, 2004 decision until the Florida Supreme Court Clerk advised on January 31, 2005 that no mandate would issue is subject to equitable tolling.  Thus, if Ms. Bonner had heeded Asay's entreaty to file the petition in January or even February 2005, it would have been timely.

[26] In so doing, the Court takes no pleasure in criticizing lawyers who have stepped "into the breach of capital litigation where relatively few lawyers will tread."  <u>Thomas</u>, 452 F.Supp.2d at 1206.

state wish to seek it.   If not, the Court will endeavor to decide the cases on the merits on an expedited basis.[27]

It is hereby

**ORDERED:**

1.    In <u>Thomas</u>, Case No. 3:03-cv-237-J-32, Respondents' request that the Court dismiss Petitioner's habeas petition as time barred, contained within Respondents' Limited Response in Opposition to the Petition for Writ of Habeas Corpus (Doc. #15) and the supplements to that response (Docs. #25 and #26), is **DENIED**.

2.    In <u>Asay</u>, Case No. 3:05-cv-147-J-32, Respondent's request that the Court dismiss Petitioner's habeas petition as time barred, contained within Respondents' Limited Response in Opposition to the Petition for Writ of Habeas Corpus (Doc. 16), is **DENIED**.

3.    The Court is of the opinion that this Order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal may materially advance the ultimate termination of the litigation.   28 U.S.C. § 1292 (b).   Therefore, any party who wishes to do so may

---

[27] As I have previously said:   "I have no idea whether any of these petitioners have meritorious federal habeas claims. . . . Certainly, the state courts in each case have concluded, after painstaking review, that the death sentences are proper.   But, the law provides for federal habeas review in capital cases and this Court is therefore obliged to provide due and proper process to these petitioners."   <u>Id</u>.

apply to the Eleventh Circuit within **TEN (10) DAYS** after entry of this Order seeking an interlocutory appeal.  If the interlocutory appeal is sought and accepted by the Eleventh Circuit, no further activity will be undertaken in these cases until the interlocutory appeal is resolved.

4.   If no interlocutory appeal is taken, the Court will conduct a telephone status conference to determine whether Petitioners' current counsel, John Mills, will be representing Petitioners on the merits and, if not, to arrange for the appointment of new counsel.[28]  Moreover, a time for Respondents to respond on the merits will be set.

5.   The Clerk will send out a separate notice of telephone hearing.

6.   All other pending motions are to be termed as either denied or moot.

**DONE AND ORDERED** at Jacksonville, Florida this 10th day of February, 2009.

TIMOTHY J. CORRIGAN
United States District Judge

---

[28] The Court has previously relieved both Dale Westling and Mary Catherine Bonner as counsel in these cases.

41

sa 2/10
Copies to:
Counsel of Record