# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

WILLIAM GREG THOMAS,

        Petitioner,

v.                                Case No. 3:03-cv-237-J-32PDB

ATTORNEY GENERAL OF
FLORIDA, et al.,

        Respondents.

_____

## <u>ORDER FOLLOWING LIMITED REMAND</u>

The protracted history of this capital habeas case is set forth in this Court's Orders (Docs. 42, 107, 141). The Court will recite only the history relevant to the Eleventh Circuit's limited remand regarding Petitioner's entitlement to equitable tolling.

## I. Status

This case was opened on March 24, 2003, when Mary Catherine Bonner, Esquire, filed an urgent motion for pre-petition appointment on behalf of Petitioner. Doc. 1. Officially appointed by the Court on March 26, 2003,[1] Ms. Bonner did not file the habeas corpus Petition until almost exactly one year later on March 22, 2004. Docs. 4, 12. In the meantime, Petitioner's federal one-year limitations period had expired on June 18, 2003.

Initially, the Court dismissed this case with prejudice after finding the Petition untimely filed and Petitioner was not entitled to equitable tolling. Doc. 42. The Court subsequently vacated that Order. Doc. 62. After hearings, supplemental briefing, and an

_____

[1] The Court stated during the hearing held on March 26, 2003, that it would enter an order appointing Ms. Bonner. The Order was entered on April 2, 2003, <u>nunc pro tunc</u> as of March 26, 2003.

evidentiary hearing, on February 10, 2009, the Court concluded that Ms. Bonner's egregious attorney misconduct, that was not previously presented as a reason for equitable tolling, warranted application of that extraordinary remedy. Doc. 107. Subsequently, the Court denied the Petition on the merits in a 66-page Order. Doc. 141.

The parties filed cross-appeals. Docs. 145, 149. The Eleventh Circuit remanded the case to this Court "to make additional and detailed findings of fact concerning Thomas's claim to equitable tolling, including exactly what may have happened and, most importantly, why counsel did not timely file this § 2254 petition." Thomas v. Attorney Gen., 795 F.3d 1286, 1287 (11th Cir. 2015). The Eleventh Circuit also instructed this Court "to apply these findings of fact to the changing landscape in the law of equitable tolling, found in the Supreme Court and [the Eleventh Circuit's] recent cases." Id. (citing Holland v. Florida, 560 U.S. 631 (2010); Maples v. Thomas, 565 U.S. 266 (2012); Cadet v. Fla. Dep't of Corr., 742 F.3d 473 (11th Cir. 2014), vacated, Cadet v. Fla. Dep't of Corr., 853 F.3d 1216 (11th Cir. 2017), petition for cert. filed, (U.S. July 25, 2017) (No. 17-6146)).[2] The Eleventh Circuit summarized its remand instructions:

> [T]he district court must provide a more thorough account of the facts of this case, including those which shed light on Bonner's decisionmaking, her understanding of the AEDPA[3] filing deadlines, her mental health, and any actions Thomas may have taken to ensure the timeliness of his petition. After laying out the basic facts of this case in greater detail—most particularly, why Bonner failed to file the petition in a timely manner—the district court must consider whether those facts

[2] The latest entry on the Supreme Court's public docket reflects that the case has been distributed for conference on February 16, 2018.

[3] Antiterrorism and Effective Death Penalty Act.

> support Thomas's claim to equitable tolling in light of the
> changing landscape of this law. Specifically, the district court
> must tell us whether the facts in this case show that Bonner
> effectively abandoned Thomas by her conduct, as the concept
> of abandonment is explicated in <u>Holland II</u>, <u>Maples</u>, and <u>Cadet</u>,
> or whether Bonner's conduct otherwise amounted to serious
> misconduct that constitutes an extraordinary circumstance.

<u>Id.</u> at 1296-97. The Circuit also directed "a more comprehensive account of [Petitioner's]

interactions with Bonner prior to the filing of his petition," so it could review whether Petitioner

acted with reasonable diligence. <u>Id.</u> at 1296.

## II. Background

### A. Correspondence Between Petitioner and Ms. Bonner

During the pendency of Petitioner's state court postconviction proceedings, he actively

sought federal representation. Petitioner, through his then-girlfriend, Monica Sipple,

contacted every lawyer listed on the capital registry in hopes of obtaining federal

representation. Doc. 84 at 90 (Petitioner's evidentiary hearing testimony: "I asked Ms. Sipple

to e-mail and mail a bunch of attorneys. And she went through the registry and just mailed

the letter to each and every one of them."); <u>see also</u> Doc. 225-1 (Petitioner's affidavit: "I

asked my girlfriend at the time, Monica Sipple, to research attorneys who may be able to

represent me in my federal habeas proceedings and she reached out to several

possibilities."). After securing Ms. Bonner's consent to represent him, he continued to

correspond with her both before and after her court appointment.[4] On March 3, 2003, before

her court appointment, Ms. Bonner wrote to Petitioner and explained that she asked

_____

[4] Petitioner's letters to Ms. Bonner do not appear in the record. However, in letters from
Ms. Bonner to Petitioner, Ms. Bonner acknowledged that she received his letters. Doc. 102
at 4, 10, 21, 22.

Petitioner's state court counsel (Mr. Westling) how much time Petitioner had left on his AEDPA limitations period, but Mr. Westling did not know. Doc. 102 at 6. She also wrote, "I believe that we must take what was filed and file a Petition for Certiorari to the United States Supreme Court in order to buy some time to file the 2254. . . . This is an extremely complicated matter and it is horrible when we have to litigate timeframes rather than substance, but, alas, that is probably where we will find ourselves." Id. On March 19, 2003, also before her court appointment, Ms. Bonner wrote to Petitioner:

> I received your handwritten letter today and spent a good deal of the day speaking with clerks and with the Federal Public Defender for the Middle District of Florida trying to get some guidance as to stopping the 2254 clock in your case. If the Commission on Capital Cases' Website is correct you have a few weeks. The FPD advised that my motion to be appointed would probably not be acted upon quickly and that you should file your own pro se 2254 and ask for my appointment or at least the appointment of counsel.
>
> This is what I propose:
>
> 1.      You fill out the affidavit of Indigency and attach it to the 2254 motion (enclosed)[.]
>
> 2.      You do the best that you can on the 2255 [sic], explaining the situation to them and at least copying the issues which were raised in your 3.850 and ask for leave to amend after appointment of counsel.
>
> 3.      Send them the letter which is enclosed to the Court indicating that I will accept appointment[.]
>
> 4.      I am filing the enclosed motion asking to be appointed.
>
> At least we will have tried to touch all bases. They are very quick to criticize us for blowing timeframes.

Doc. 102 at 10.

4

Ms. Bonner advised Petitioner on March 26, 2003, that she had been appointed to represent him. Doc. 102 at 13. On April 3, 2003, still prior to the expiration of the one-year limitations period, Petitioner signed a habeas petition that had been sent to him by Ms. Bonner. Doc. 225-1 at 3-4; Doc. 102 at 14-19; Doc. 84 at 105, 160-62.[5] Because this Court had appointed Ms. Bonner to represent Petitioner, he knew he could not file the petition pro se. Doc. 225-1 at 4; Doc. 84 at 111. So, he instead sent it to Ms. Bonner for filing. Doc. 84 at 105-06, 162.

On April 10, 2003, Ms. Bonner again wrote to Petitioner. In pertinent part, she stated:

> Don and I met yesterday and have come to the conclusion that after a little further review, in all likelihood it would be better to file a Petition for Certiorari with the United States Supreme Court. I will notify the United States District Court for the Northern[6] District of Florida that I am filing this and that I am not charging for the preparation of it as I assured them that we were finished with the State process. In the meantime we will be preparing the 2254 so that if the Petition for Cert is denied, we will be ready to file virtually immediately.

Doc. 102 at 20. Five days later, Ms. Bonner again wrote to Petitioner and provided materially inaccurate information regarding the expiration of the one-year limitations period:

---

[5] Petitioner testified that Eric Branch, another death-row inmate, completed a habeas petition on Petitioner's behalf and with Petitioner's direction. Doc. 84 at 162; see Doc. 225-1 at 3-4. The petition completed by Mr. Branch is not part of the record. Despite the confusion regarding the different petitions that were completed, there is no dispute that Petitioner signed the Petition that was ultimately filed in this case on April 3, 2003, although it appears Ms. Bonner completed the rest of the form. See Doc. 84 at 142-47, 160-62.

[6] The Court assumes Ms. Bonner intended to write "Middle" rather than "Northern," although the only paper she filed in this Court in April and May was a litigation budget on May 28, 2003. Doc. S-1. She never filed a petition for certiorari on Petitioner's behalf in the United States Supreme Court.

> I have been reading the hearing transcript and researching the timeliness of the 2254 motion. From what we can ascertain your 365 days for 2254 filing ran **before** your 3.851 petition was filed–in that mess with counsel that was none of your fault. I am in the process of reviewing all of the timeframes and the substantive materials. Our first hurdle may well be timeliness. Since it is already untimely, we will give it another week or so of preparation time so that we can present to the United States District Court the strongest case and try to persuade them that there is every reason to hear our arguments.

Doc. 102 at 21. As we now know, the limitations period had not yet expired and Ms. Bonner waited well over a "week or so" to actually file the Petition.

Ms. Bonner's letter of June 4, 2003, still before the expiration of the limitations period, is heavily redacted, but she stated that "a budget and a few other things" had been filed, "but the substantive work has not been completed." Doc. 102 at 22-23. She assured Petitioner: "We are working even if we are not writing all of the time." Id. at 23. Before she mailed her next letter to Petitioner, the limitations period expired.

On July 28, 2003, Ms. Bonner wrote to Petitioner: "We are shooting for a date in late August to file." Doc. 102 at 25. She further stated, "As you know, the dates under the AEDPA were gone long ago,[7] and we have made the considered decision that to file a complete set of moving papers is the way to go." Id. On August 27, 2003, she sent Petitioner a letter with the following instructions:

> I am enclosing two documents for you. Please fill them out as directed below and send them back as soon as possible.

---

[7] In reality, the period had expired 40 days prior to her authoring this letter.

1.      Petition under 28 USC § 2254. Look through it for your information and place your signature on the last page. Please return the last page.[8]

2.      Xerox of book with State Motion for Postconviction Relief. Please fill in the form to the best of your ability. If you do not remember dates, etc. we will find them. The only issue on which we are proceeding is involuntariness of the plea. I will send you a request for indigent status form later.

3.      Unnotarized oath. Please sign and return.

Doc. 102 at 26.

Seven months later, on March 22, 2004, Ms. Bonner finally filed the Petition. Doc. 12.

The date next to Petitioner's signature on the Petition is April 3, 2003. Id. Of course, if the

Petition had been filed at or near April 3, 2003, it would have been timely.

On June 21, 2004, Ms. Bonner wrote to Petitioner:

At this point I am not sure whether the girl sent you all of our documents. Of course the State said that we were untimely–big news. We *had to investigate; we had to follow your leads.* Even if some went nowhere, we had to have time to do it or you weren't getting representation.

Then I decided that we couldn't just stand on what they will say is a weak argument so I reached out to certain organizations which regularly join in amicus briefs. They gave me favorable responses so I asked the judge if we could have time to develop a Constitutional attack. He just granted that until July 30.[9] That is incredibly good news, so I am on the attack.

---

[8] Petitioner testified that he did not understand why Ms. Bonner sent him a petition to sign in August 2003 when he had already signed one in April 2003. Doc. 84 at 116.

[9] Ms. Bonner was referring to the Court's Order (Doc. 19) granting Petitioner additional time in which to file a reply.

Sorry that I don't write more, but I am working on your stuff. <u>We are going to put on a sophisticated presentation through I wish to lay the groundwork for an attack on the limitations placed by Congress in the AEDPA. Long road, but we have to do it.</u>

I hope that all is well with you and I will keep you apprised.

Doc. 102 at 24 (emphasis added).

### B. Pre-Remand Procedural History

This Court first became aware of Petitioner's federal habeas claims on March 24, 2003, when Ms. Bonner filed a motion seeking to be appointed to represent Petitioner in this Court. Doc. 1. The motion states that counsel was contacted by Petitioner's state postconviction counsel in February 2003, and in light of relevant time constraints, the matter was of an urgent nature. Taking Ms. Bonner at her word, the Court immediately conducted a hearing on March 26, 2003. Ms. Bonner appeared telephonically and requested immediate pre-petition appointment so that she could timely prepare and file a habeas petition. Ms. Bonner advised the Court of her qualifications, and feeling confident that Ms. Bonner's experience would bode well for Petitioner, the Court appointed her.

Nothing happened for two months. On May 28, 2003, Ms. Bonner filed an ex parte proposed litigation budget. Doc. S-1. Curious as to the lack of urgency on Ms. Bonner's part to get the petition filed after she requested an expedited appointment, the Court entered an Order directing Petitioner to file a notice by June 17, 2003, updating the Court on the status of the case. Doc. 5. On June 18, 2003, Ms. Bonner filed two ex parte requests for

investigative fees. Docs. S-3, S-4.[10] At the same time, Ms. Bonner filed an ex parte status report, which stated in pertinent part:

> Undersigned counsel and her investigator have visited with Mr. Thomas. Undersigned counsel has read and indexed the record of the 3.850 hearing and is proceeding with a review of the relevant trial transcript as well as the record on appeal.
>
> The investigation done thus far has yielded that absolutely no factual investigation in preparation for the trial or for the Motion to Vacate has been accomplished. Mr. Thomas has advised that there was substantial, relevant investigation which he wished accomplished.
>
> . . . .
>
> As the Court can imagine, it is a difficult situation. Counsel does not wish to file a motion with this court which does not present all facts and issues which are to be litigated before it because of the fear that this will not be deemed a properly filed motion and may prejudice the right to collateral review due to Mr. Thomas.
>
> Even under the AEDPA it is contemplated that litigants have one year to investigate and prepare their federal claims. Unfortunately, due to the manner in which the time is to be calculated, counsel who enter the case for the first time at a late stage do not have the benefit of that year and frequently have the benefit of virtually no time. Undersigned counsel wishes to present a complete petition and anticipates that investigation, research, and drafting will consume at least six weeks' more time.

Doc. 108 (previously Doc. S-8) (emphasis added).

On July 21, 2003, Mr. Bonner filed another status report. Doc. 109 (previously Doc. S-12). Ms. Bonner stated that information she had just received required her to engage in

---

[10] These documents were received by the Clerk on June 10, 2003, but not filed until June 18, 2003, because they could not be filed under seal without a Court order (which was signed on June 15, 2003, Doc. S-2).

"substantial investigation including the gathering of records of litigation of individuals other than Mr. Thomas." Id. Additionally, she wrote:

> Once again, as stated earlier, counsel does not wish to file a motion with this court which does not present all facts and issues which are to be litigated before it because of the fear that this will not be deemed a properly filed motion and may prejudice the right to collateral review due to Mr. Thomas. There had been no factual investigation completed–as it appears from the Record–at either the trial or the post-conviction stage. This new ground hopefully is fertile and will establish factual support for the issues to be raised.
>
> Additionally, Mr. Thomas pled guilty in a death case in the State Court and received a life sentence in that matter. It appears that that plea not only affected the instant trial court's arrival at the sentence of death, but also, because Mr. Thomas was not appointed counsel in that separate case, no appropriate post-conviction attack was made. The two cases are inextricably intertwined and counsel is evaluating the proper manner in which to proceed. In all likelihood, although counsel is not appointed for this purpose and certainly will not include the work in any billings to this Court, a separate State habeas motion will be filed as a determination of the knowledge and voluntariness of the plea is vital to this Court's consideration of the entirety of the matter.[11] The filing of the State action will not delay the initial filing herein.
>
> Undersigned counsel wishes to present a complete petition and anticipates that investigation, research, and drafting will consume at least six additional weeks' time.

Id.[12]

---

[11] The last entry on the state court's docket in this companion case was made on March 13, 1997. See State v. Thomas, No. 16-1993-CF-5393-AXXX-MA (Fla. 4th Cir. Ct.). No postconviction motions were ever filed in that case.

[12] It is troubling now knowing that on April 15, 2003, Ms. Bonner had erroneously advised Petitioner that his one-year limitations period had expired, yet she failed to advise the Court of this in either status report. Of course, the Court now knows but did not know then, that the one-year limitations period actually expired on June 18, 2003.

In August 2003, Ms. Bonner filed a request relating to her investigation. Docs. S-13, S-14. Still without having a petition filed, on February 19, 2004, the Court ordered Petitioner to advise the Court of the status of the case or face dismissal for failure to prosecute. Doc. 7. On March 15, 2004, Ms. Bonner filed a status report and asked for leave to file the federal petition no later than March 19, 2004. Doc. 8. The Court entered an Order advising Petitioner that leave was not required, and noting that any determination as to timeliness would be made after the filing of the petition and the response. Doc. 9. Finally, after the Court chased Ms. Bonner for months, she filed the Petition on March 22, 2004, but the saga was just beginning.

At the first hearing on the timeliness issue held on January 18, 2006, Ms. Bonner was unable to explain exactly why she had filed the Petition late, other than saying that she needed more time to investigate Petitioner's case and she intended to rely on equitable tolling as a basis to have the merits of the Petition heard. She further addressed the state system set up to provide death-sentenced inmates with counsel.

> MS. BONNER: . . . I'm trying to get across to the court it was - - you realize that when I received this case I had but a few days to do the petition, two weeks, three weeks, whatever it was to do the petition.[13] And when I learned there were new grounds that changed the entire complexion of the case, I had the choice of presenting to you something that I would want you to stay and would add new factual findings to, factual investigation to, but the state would have come back immediately, as the court well knows, and said that the new things did not come from that common core of operative facts

---

[13] Including the day this Court appointed Ms. Bonner to represent Petitioner (March 26, 2003) and the day the limitations period expired (June 18, 2003), Ms. Bonner had eighty-five days to complete and file a petition.

which had been dealt with by the state. And they had not, in fact, been dealt with by the state.

But I'm saying that the 300 - - the Florida system is set up in such a way that Mr. Morrow was able to use up 321 days of the 365 days with no monitoring of any kind and was permitted to have - - to - - Mr. Thomas was left with no remedy, no - - no product from that and no remedy other than - -

. . . .

In light of the actual functioning of Florida's system of capital collateral relief and registry in this instance where two counsel had already been appointed and yet no product for the federal system was even in the process of being prepared, and where Mr. Thomas after extensive debriefing and investigation revealed an issue which had never arisen before, that I had a duty to investigate that issue, and that the one year - - taking the one year is not an irrational thing - - one year itself is not irrational. We can't say it was irrational because Congress gave us a year, so we can't say Congress is irrational. But even the Eleventh Circuit - - no - - yeah.

The Eleventh Circuit in a case where a fellow had moved to set aside one of his priors because he was, I think, ACCA, and they said, no, you've blown your AEDPA time, when it went to the Supreme Court of the United States, they said, No, the Eleventh was wrong and his timing was was to begin anew; in other words, he had a year from then, from the time that the Supreme Court found that the Eleventh Circuit was wrong. They didn't ask - - they didn't parse out the times before that. Congress - -

THE COURT: You and I might even be able to agree - - or reasonable people, let's put it that way, might agree that it would be an easier, more predictable system if federal petitions had to be filed a year after all state proceedings had concluded; . . . but that's not what the law is, right?

And - - it's abundantly clear that's not what the law is . . . and I think your argument recognizes that's not what the law is because you are telling me the only way I can rule in your favor is to find that that period of investigation that you undertook on behalf of your client qualifies for equitable tolling.

MS. BONNER: And that the - - the Florida system, which does not require that the same lawyer continue a case or require that that lawyer be a - - a member of this bar or be in the process of preparing something from this bar - - for this bar, is so faulty that when a practitioner from this court takes over, a reasonable amount of time is necessary.

THE COURT: . . . [W]hat's the legal basis for that second argument? Is that a constitutional argument? . . . [W]hat kind of argument is that?

MS. BONNER: It is - - what I am saying to you is that the statute in Florida is faulty, that the - - people of the United States do not want anyone executed unless all due process is adhered to, is taken. . . . But what I am saying is that when Congress contemplated a one year period of time in which the federal process would be stayed, it anticipated that there would not be these kinds of delays in the state system or the state system would not work in the way it's working.

As I said in some of my moving papers, I'm sure that none of the people in Congress have ever litigated one of these, but when you change from counsel to counsel and you change from court to court - - and I have had two different lawyers who were on the registry who did not wish to come to federal court at all, they had mentioned to me that they tried to find counsel to supplement for them, to come in for them, to substitute for them in the federal court when they were done doing what they were very comfortable with, which was the state court process, and were unable to do so. . . .

<u>So what was in my mind? My mind was telling me that the year was a reasonable length of time, that nothing had been done in that other year. Perhaps if I had been more artful, I would have advised the court of it. My decision as I saw it at the time was should I file a shell which might not even cover what he is talking about.</u>

And it would have had things in there that our investigation, of course, led us down and we did not find those to be so, should I file that just to trigger, you know, a stamp of approval. Or should I present to the judge an argument that is supported and it is coherent.

Doc. 38 at 38-43 (emphasis added). Notably absent from Ms. Bonner's statements was whether she advised Petitioner of her intended strategy. The Court was incredulous that a member of the Bar would deliberately let a statute of limitations expire in a capital habeas case, hoping later to convince the Court to apply equitable tolling.

Given the Court's concerns, the Court appointed co-counsel, John Mills, Esquire (who remains Petitioner's counsel to this day) to further address the timeliness issue. Doc. 31. The Court held another hearing on December 17, 2007, at which Ms. Bonner in part blamed the mental and physical health of her husband and herself as reasons for her actions.[14] Doc. 63 at 79-82.

Subsequently, on February 21, 2008, the Court held an evidentiary hearing, the transcript (Doc. 84) of which is incorporated herein. Ms. Bonner and Petitioner both testified at the evidentiary hearing. Respondents' summary of this testimony is largely accurate:

> At the evidentiary hearing, Petitioner William Greg Thomas testified that his girlfriend, Ms. Sipple, sent a letter to Mary Katherine Bonner. (T. 87, 89). On January 6, 2003, Ms. Bonner sent an email back to Ms. Sipple. (T. 89). Ms. Bonner indicted [sic] that she would represent Thomas and was familiar with federal habeas. (T. 92). The email contained a discussion of the applicable time frames. (T. 93, 94). On January 21, 2003, approximately five months before Thomas' habeas petition was due on June 18, 2003, Ms. Bonner wrote him a letter. (T. 95). On January 30, 2003, Dale Westling, his state counsel, wrote Thomas a letter, saying that he was going to ask state court judge, Judge Wiggins, to appoint an attorney to handle his federal habeas. (T. 96-97). On March 3, 2003, over three months before Thomas' petition was due, Ms. Bonner wrote Thomas telling him that Dale Westling did not

_____

[14] The Court has taken measures throughout this case to protect Ms. Bonner's privacy. Rather than repeat what she said on the record that day, the Court incorporates the transcript herein.

know when Thomas' habeas petition was due. (T. 98). Ms. Bonner expressed the intention of filing a petition for certiorari in the United States Supreme Court "to buy some time" to file the federal habeas petition. (T. 98). Thomas was left with the impression that Ms. Bonner knew what she was talking about and his petition would be timely filed. (T. 99). Ms. Bonner, in a letter to Dale Westling referred to the prosecutor's agreement not to assert any time bars but noted that regardless of that agreement, many courts explore their "own jurisdiction when neither party wishes it." (T. 100). On March 10, 2003, over three months prior to Thomas' habeas petition being due in federal court, state counsel, Dale Westling wrote a letter to Thomas, saying that the [sic] he filed a motion for appointment of counsel in federal court but that the judge declined to appoint Ms. Bonner to represent him. (T. 101). On March 19, 2003, approximately three months prior to the habeas petition being due, Ms. Bonner wrote a letter to the clerk of this Court stating that the time for Mr. Thomas to timely file his federal habeas petition was running out. (T. 103). On March 19, 2003, approximately three months prior to the habeas petition being due, Ms. Bonner also wrote a letter to Thomas explaining that the federal public defender had advised her that her motion to be appointed as habeas counsel would probably not be acted upon quickly and advising Thomas to file the federal habeas petition pro se. (T. 104). Ms. Bonner enclosed a habeas petition for Thomas and advised Thomas to copy the issues raised in his state 3.850 motion and ask for leave to amend after the appointment of counsel. (T. 105). Thomas completed the habeas and sent it back to Ms. Bonner to notarize and send to the court per her instructions. (T. 105-106). The handwritten date next to Thomas' signature on the habeas petition, filed as Doc #12, was April [3], 2003 which was over two months before the habeas was due. (T. 106). On March 24, 2003, approximately three months prior to the habeas petition being due, Ms. Bonner wrote a letter to Thomas saying that she received a call from prosecutor George Bateh informing her that Mr. Westling was going to continue to represent Thomas in federal court. (T. 107). On March 25, 2003, Mr. Westling wrote a letter to Thomas. (T. 107-108). On March 26, 2003, approximately three months prior to the habeas petition being due, Ms. Bonner wrote a letter to Thomas saying she was appointed today. (T. 108-109). On April 10, 2003, approximately two months prior to the habeas petition being due, Ms. Bonner wrote a letter to Thomas saying

it would be better to file a petition for writ of certiorari in the Supreme Court than a habeas petition in federal district court. (T. 109-110). She wrote that she would continue to prepare the § 2254 petition, so when the certiorari petition was denied "we will be ready to file virtually immediately." (T. 110). Thomas did not file the § 2254 petition himself because he had no reason to believe the [sic] Ms. Bonner was not handling it. (T. 110). Thomas explained that if you file a petition yourself when you are represented by counsel they reject it—you cannot file pro se. (T. 111). On April 15, 2003, approximately two months prior to the habeas petition being due, Ms. Bonner wrote a letter to Thomas stating that his time to file ran before his 3.851 motion was filed in state court "in that mess with counsel." (T. 111). She stated that the first hurdle may be timeliness and since it is already untimely, she was going to "give it another week or so of preparation time." (T. 111). Thomas "figured" Ms. Bonner had lied to him. (T. 112). On June 4, 2003, fourteen days prior to the deadline, Ms. Bonner wrote a letter to Thomas stating that she was working. (T. 112-114). On June 21, 200[4], . . . Ms. Bonner wrote a letter to Thomas stating that the State had asserted that the habeas petition was untimely. (T. 114). She also wrote in this letter that the judge granted her additional time until July 30th to develop a constitutional attack which was "incredibly good news" and she was laying the groundwork for an attack on the AEDPA's time limitation which would be a long road but "we have to do it." (T. 115). On July 28, 2003, . . . Ms. Bonner wrote a letter to Thomas stating the dates under the AEDPA "were gone long ago" and so she made the "considered decision" to file a complete set of moving papers. (T. 115). On August 27, 2003, . . . Ms. Bonner wrote a letter to Thomas which included a § 2254 petition. (T. 116). Thomas did not know that she had not filed the petition he sent her in April of 2003. (T. 116).

Doc. 104 at 9-13 (footnotes omitted).

On cross, Petitioner testified that he concluded later on that Ms. Bonner had lied to him in her April 15, 2003 letter, when she said his federal limitations period had run before he filed his rule 3.851 motion in state court, and that at that time, he really "didn't know what to think." Doc. 84 at 118, 123. He acknowledged that Ms. Bonner had told him about the

importance of the limitations period, but that she also told him "the time issues were technical and . . . could be dealt with later." <u>Id.</u> at 126. He assumed she knew of "some loophole or something." <u>Id.</u> at 123. When asked whether he concluded that Ms. Bonner was lying to him when she said on April 10 that his period had not expired yet but then on April 15 she stated it had long-ago expired, Petitioner responded, "Well, some - - something had to be wrong. She was mistaken, lying. Someone had to know what they were talking about." <u>Id.</u> at 122.

Ms. Bonner also testified:

> She had no idea why she came to the conclusion that the time had run out. (T. 140). She believed that the filing of [a] petition of writ of certiorari in the Supreme Court from the state postconviction proceedings tolled the time to file a habeas petition in the district court. (T. 142). When asked why she did not file the pro se petition signed by Thomas on April 3, 2003, she testified there was no such document. (T. 142-143). According to Ms. Bonner, there was no document filled out by Thomas that was sent to her. (T. 143). It was her handwriting in the March 22, 2004 habeas that was filed. (T. 144). She had no idea why the date of Thomas' signature was April 3, 2003 and did not know if it was accurate. (T. 144). Her files regarding the Thomas case were destroyed by Hurricane Wilma in 2005. (T. 147). Ms. Bonner adopted her prior statements at the oral argument in December 17, 2007, regarding her husband's health. (T. 149, 154). Her family issues were "very severe and very overwhelming." (T. 150). Due to the "very difficult time[]" she made mistakes. (T. 151). She testified that she was aware of <u>Coates v. Byrd</u>, 211 F.3d 1225, 1227 (11th Cir. 2000) but that there was a circuit split regarding the issue of whether a petition for writ of certiorari from state postconviction proceedings tolled the time to file. (T. 153).

> The court asked Ms. Bonner as an officer of the court whether it was proper to miss a deadline simply because there was more to do on the pleading. (T. 155). She did not believe that she could have filed a skeletal motion. (T. 155). She believed that factual innocence was at issue in the case. (T. 156). The court noted that there was no claim of factual

> innocence in the record but she explained that she was exploring the issue. (T. 156). The court noted that he had appointed Ms. Bonner on an emergency basis because the time was running out. (T. 156). <u>The court asked why she had moved for an emergency appointment and then not filed the habeas petition on time and she stated that she felt like developing certain issues based on her conversation with Thomas.</u> (T. 156-157). <u>She testified that she intended to rely on equitable tolling to excuse the late filing.</u> (T. 157).

Doc. 104 at 14-15 (emphasis added). When asked why she did not file a petition that copied the issues Petitioner had raised in his Rule 3.850 motion, Ms. Bonner stated: "I wish I knew the answer. I wish I could go back and revisit it. . . . I wish I had not been in such a health situation with both my husband and myself, but I was." Ex. 84 at 159.

Petitioner was called again to clarify the issue of the handwriting on the Petition that was filed in this case. He confirmed that it was not his handwriting nor was it Mr. Branch's handwriting, but it was his signature next to the April 3, 2003 date. Doc. 84 at 160-62.

After receiving supplemental briefing from the parties, the Court found Petitioner entitled to equitable tolling, Doc. 107, and then denied the Petition on the merits. Doc. 141.[15]

### C. Post-Remand Procedural History

In accordance with the Eleventh Circuit's remand order, this Court directed the parties to file supplemental briefs addressing the equitable tolling issue, advise the Court whether a further evidentiary hearing was necessary, and address whether the Court should stay the case pending the Supreme Court's decision in <u>Hurst v. Florida</u>, 135 S. Ct. 1531 (2015). Doc. 174. Petitioner filed a notice requesting a stay pending the <u>Hurst</u> decision, an evidentiary

---

[15] The Court did grant a COA on certain issues. Doc. 141 at 65.

hearing, and permission to file supplemental briefing after the hearing. Doc. 175.[16] Respondents filed a substantive brief in which they maintain the position that Ms. Bonner deliberately missed the limitations deadline as part of her litigation strategy. Doc. 181. Upon review of the parties' filings, the Court set an evidentiary hearing for August 23, 2016, and denied as moot Petitioner's request to stay the case because <u>Hurst</u> was decided. Doc. 182.

On June 29, 2016, Petitioner filed a motion requesting access to certain sealed documents, and on July 14, 2016, he filed a motion seeking permission to engage in discovery. Docs. 183, 184. The Court set a telephonic status hearing to address Petitioner's motions, Doc. 185, and held a hearing on July 25, 2016, Doc. 188. After the hearing, the Court entered an Order permitting counsel to (1) depose Ms. Bonner; and (2) subpoena certain documents from Union Correctional Institution. Doc. 190. The Court also permitted Petitioner's counsel access to certain sealed documents. The evidentiary hearing set for August 23, 2016 was canceled, and the parties were instructed to file a joint report by September 23, 2016.

The parties deposed Ms. Bonner on August 22, 2016. Doc. 198-1. The questions largely focused on her physical and mental health. She acknowledged that in 2003 and 2004, she did not consider herself to be suffering from any sort of mental or physical impairment that would impede her ability to represent her clients. She stated that it was not until she was diagnosed in 2008 with a heart condition, that she started to think about how

---

[16] Petitioner also filed a request to amend his Petition to include an Eighth Amendment claim stemming from the <u>Hurst</u> litigation. Doc. 176. The Court denied the request, noting that it lacked jurisdiction to do so because the case was before the Court on limited remand from the Eleventh Circuit. Doc. 182.

this may have been affecting her in the past. Id. at 99. She also confirmed that in 2003 and 2004, she was actively representing other clients and orally argued before the Florida Supreme Court,[17] and in 2006, she orally argued before the United States Supreme Court.[18] Id. at 84-85, 102-08.

On September 23, 2016, the parties filed a Joint Status Report, in which Petitioner sought permission to conduct additional discovery, including deposing two of Ms. Bonner's physicians and retaining an expert psychiatrist. Doc. 197. Over Respondents' objections, the Court permitted the depositions,[19] Doc. 201, and after supplemental briefing and a telephonic status hearing, the Court granted Petitioner's request and appointed Jeffrey Fliesser, M.D. as a mental health expert, Doc. 211. This was in keeping with the Eleventh Circuit's remand order which noted that the record did not contain "any expert psychiatric or psychological testimony addressing the issue of mental impairment." Thomas, 795 F.3d at 1296.

---

[17] See Brown v. State of Florida, SC02-1787 (Fla.) (The docket reflects, inter alia, that Ms. Bonner appeared as counsel on September 30, 2002; filed an initial merits brief on July 21, 2003; filed a reply brief on January 15, 2004; orally argued the case on March 3, 2004; and filed a motion for rehearing on December 17, 2004); Cave v. State of Florida, No. SC03-95 (Fla.) (The docket reflects that Ms. Bonner filed the notice of appeal on January 21, 2003; filed an initial brief on the merits on August 11, 2003; filed a reply brief on May 13, 2004; and filed a motion for rehearing on February 28, 2005).

[18] Ms. Bonner began representing Mr. Lawrence in May 2003 in the United States District Court for the Northern District of Florida. See Lawrence v. State of Florida, No. 3:03cv97-RH (N.D. Fla. 2003). She continued her representation of him in the Eleventh Circuit, Lawrence v. Florida, 421 F.3d 1221 (11th Cir. 2005), and the United States Supreme Court, Lawrence v. Florida, 549 U.S. 327 (2007) (orally argued on October 31, 2006).

[19] As directed, the deposition transcripts of Ms. Bonner's physicians were filed under seal. Doc. S-217.

The parties were directed to and did file status reports. Docs. 214, 215. Petitioner requested an additional ninety days so that Dr. Fliesser could examine Ms. Bonner and counsel could interview Ms. Bonner's former assistant and one of Ms. Bonner's friends. Petitioner also requested the Court approve an additional $3,750 in expert services to allow Dr. Fliesser to complete his tasks. The Court granted Petitioner's requests, and reset the evidentiary hearing for June 29, 2017. Doc. 216.

On May 19, 2017, the parties filed a joint motion asking the Court to accept a stipulation as to certain facts, permit Petitioner a reasonable amount of time to file affidavits, cancel the evidentiary hearing, and set a briefing schedule. Doc. 221. The parties' Stipulation states in full:

> Petitioner William Greg Thomas and Respondent the Attorney General of Florida hereby enter the following factual stipulation regarding the issue of equitable tolling. The Eleventh Circuit remanded this case for additional factual findings on this issue, including a finding as to why Mary Katherine Bonner, Esq., failed to timely file the habeas petition in this action and whether that failure was based on intentional conduct, cognitive impairment, or some other reason, and further legal analysis as to whether those additional findings support equitable tolling under the current state of the law. The parties conducted additional discovery, including appointment of a mental health expert, and could find no definitive evidence of cognitive impairment at the time of the missed deadline in 2003. <u>Instead, the evidence and discovery in this case has led to one conclusion—as the State previously contended, Ms. Bonner missed the deadline as part of a deliberate strategy to challenge the constitutionality of AEDPA's statute of limitations because she was interest[ed] in invalidating AEDPA's statute of limitations itself.</u> More specifically, the parties stipulate as follows:
>
> 1.     On January 6, 2003, Mary Katherine Bonner, Esq., corresponded with Petitioner about being retained to prosecute his federal habeas petition.

2. On March 19, 2003, Ms. Bonner informed the Clerk of the Court that she was willing [to] accept appointment and that Petitioner intended to file his habeas petition.

3. On March, 19, 2003, Ms. Bonner sent Petitioner a template habeas petition to fill out and directed him to copy the issues raised in his state postconviction petition.

4. On April 2, 2003, Ms. Bonner was appointed to represent Petitioner in this Court.

5. On April 3, 2003, Petitioner signed the habeas petition.

6. <u>Ms. Bonner, however, had another goal in addition to filing Petitioner's habeas petition. Specifically, she had developed an interest in challenging the constitutionality of the AEDPA deadline based on her own belief that the one-year statute of limitations did not allow sufficient time for investigation and preparation of a petition for writ of habeas corpus.</u>

7. <u>Ms. Bonner deliberately delayed filing the petition in order to use Petitioner's case as a test case to challenge AEDPA's statute of limitations.</u>

8. Ms. Bonner did not file the habeas petition by June 18, 2003, the date the statute of limitations under AEDPA ran.

9. Instead, Ms. Bonner filed the petition on March 22, 2004.

Doc. 220 (emphasis added). Upon presentment of the Stipulation to the Court, the Court agreed to cancel the evidentiary hearing, accept the Stipulation, and order supplemental briefing. Doc. 222. After affording both parties additional time to file their respective briefs, Doc. 222, Petitioner filed his brief on July 24, 2017, and Respondents' brief was filed on October 2, 2017. Docs. 225, 233. Attached to Petitioner's brief are his affidavit (Doc. 225-1) and an affidavit of Eric Branch, another death-row inmate (Doc. 225-2).

In relevant part, Petitioner's affidavit states:

> I am an inmate at Union Correctional Institution ("UCI") with DC# 311509 and the Petitioner in the above-styled case.

> In late 2002, while my state postconviction proceeding was pending, I had discussions with two other inmates at UCI, Mark Asay and Eric Branch. Both of them warned me about being mindful of the federal habeas petition deadline and I wanted to ensure that I maintained my right to federal review.

> Accordingly, I asked my girlfriend at the time, Monica Sipple, to research attorneys who may be able to represent me in my federal habeas proceedings and she reached out to several possibilities.

> In December 2002, Ms. Sipple corresponded with Mary Kate Bonner, Esq., about representing me and, in January 2003, Ms. Bonner sent me a letter expressing her willingness to handle my case, noting the criticalness of the time frames for filing the habeas petition.

> Based on the detailed information in her email to Ms. Sipple and her letter to me, along with her impressive resume, I believed she had a good handle on the issues and deadlines, and I believed at the time she would represent me well in my federal habeas proceedings.

> My state court collateral proceedings became final on January 30, 2003, when the Florida Supreme Court affirmed the state circuit court's denial of my initial postconviction petition.

> Both Ms. Bonner and I informed my attorney at the time, Mr. Dale Westling, Esq., that I wished to have her appointed to represent me in federal court.

> On March 3, 2003, Ms. Bonner sent me a letter about obtaining the information she needed from Mr. Westling and telling me the steps she believed we needed to take to prepare my habeas petition. This letter again indicated to me that Ms. Bonner was on top of the deadline and would timely file my petition.

On March 4, 2003, Mr. Westling filed a motion for substitution of registry counsel in state court, seeking to have Ms. Bonner appointed to replace him as my registry attorney.

On March 10, 2003, Mr. Westling wrote to inform me that the state court judge declined to appoint Ms. Bonner.

On March 19, 2003, Ms. Bonner sent a letter to the Clerk of the U.S. District Court for the Middle District of Florida informing him that I would be filing a habeas petition and that the time was almost out, and requesting that the Court appoint her to represent me in federal court.

On March 19, 2003, Ms. Bonner also sent me a form habeas petition, which had already been completed in someone else's handwriting. The letter stated that I had just a few weeks left before the habeas petition was due, and directed me to complete an affidavit of indigency, copy the issues raised in my state court postconviction petition, and request leave to amend the petition at a later date.

On March 26, 2003, Ms. Bonner wrote to inform me that she had been appointed that day in federal court.

With the assistance of Mr. Branch, another UCI inmate who was more knowledgeable about legal issues than me, we followed Ms. Bonner's directions as to completing the habeas petition she sent me. Mr. Branch took a copy of my state postconviction petition, cut out the issue headings, and pasted them onto a separate piece of paper. At my direction, Mr. Branch added handwritten notes under each issue heading that I reserved the right to amend at a later date and also drafted a handwritten two-page motion reserving the right to amend the petition.

Mr. Branch also assisted me with drafting a letter to Ms. Bonner, which enclosed the completed petition, attached memorandum, and motion to amend. The letter specifically directed Ms. Bonner to immediately file the petition and do so in advance of the deadline. The letter also noted that she must do so because the Court would not accept a pro se filing from me.

On April 3, 2003, after I learned she had been appointed, I signed the completed habeas petition pursuant to her instructions, and sent them that day to the notary department to notarize them and get them sent to Ms. Bonner directly for filing. I also knew that, had I tried to file any petition myself, it would not have been accepted because I was represented by an attorney at the time.

Based on everything Ms. Bonner had said to me since January 2003, including the fact that [she] sent me a completed habeas petition with instructions on what I should do to preserve my right to federal review, I believed she was on top of it and would follow my directions to timely file the petition and accompanying pleadings. She had given me no reason to believe otherwise. In fact, I had to rely on what Ms. Bonner told me about my case because I had no way to access the Court's online docket system while at UCI. So, I put my faith in her to be truthful with me and follow my specific instructions.

A couple weeks later, on April 15, 2003, Ms. Bonner sent me a letter indicating that the deadline for filing the habeas petition had expired even before I had filed my state postconviction petition and that the petition was untimely. Because Ms. Bonner's letter did not say otherwise, I believed she had filed the petition that I had directed her to file, but that it was itself late. Based on her correspondence to me and our conversations, I had absolutely no reason to believe that she would not have followed my instructions to file the petition on time or that she would lie to me about when the actual deadline expired.

In fact, the first time I learned that Ms. Bonner had not timely filed the habeas petition, which I prepared and sent to her with directions to file it on April 3, 2003, was when Judge Corrigan entered the first order dismissing the petition as untimely on March 15, 2006.

I was shocked. Ms. Bonner had been dishonest with me, not only about the deadline itself, but about the fact that she had not filed the petition that I had signed and directed her to file long before the actual deadline.

Once I learned that the Court had dismissed the petition as untimely, Mr. Branch helped me draft a letter to Judge

25

Corrigan explaining how I had completed the habeas petition and directed Ms. Bonner to file it before the deadline. That letter was mailed to the Court on May 4, 2007, and filed in the record under seal as document S-20.

I can say without hesitation that had Ms. Bonner ever told me that she had failed to follow my directions to file the habeas petition back in April 2003, I would have immediately prepared another habeas petition and filed it myself in advance of the June 2003 deadline.

Doc. 225-1 (paragraph enumeration omitted; emphasis added).

Mr. Branch's affidavit states in pertinent part:

On March 19, 2003, Ms. Bonner mailed Mr. Thomas a form habeas petition, which had already been completed in someone else's handwriting. I assumed Ms. Bonner had filled it out.

Ms. Bonner's letter indicated that Mr. Thomas had just a few weeks left before the habeas petition was due, and it directed Mr. Thomas to complete an affidavit of indigency, copy the issues raised in his state court postconviction petition, and request leave to amend the petition at a later date.

I assisted Mr. Thomas with completing these tasks. I took a copy of his state postconviction petition, cut out the issue headings, and pasted them onto a separate piece of paper. At Mr. Thomas's direction, I added handwritten notes under each issue heading that Mr. Thomas reserved the right to amend at a later date and also drafted a handwritten two-page motion reserving the right to later amend the habeas petition.

I also assisted Mr. Thomas with drafting a letter to Ms. Bonner, which enclosed the completed petition, attached memorandum, and motion to amend. The letter directed Ms. Bonner to file the petition in advance of the deadline. I also believe the letter noted that Ms. Bonner must file the petition herself because the Court would not accept a pro se filing from Mr. Thomas.

> Mr. Thomas signed the letter, petition, and attached motion to amend on April 3, 2003, and he sent the documents to the notary department to notarize them and get them sent directly to Ms. Bonner for filing.

> A couple weeks later, Mr. Thomas received a letter from Ms. Bonner indicating that the deadline for filing the habeas petition had expired before Mr. Thomas had filed his state postconviction petition and that the petition was untimely. Because Ms. Bonner's letter did not say otherwise, I believed she had filed the petition as Mr. Thomas directed her to do but that it was itself late.

> Between April and June 2003, I had at least two conversations with Ms. Bonner on the phone and in person about possibly retaining her assistance on my case. During those conversations, Ms. Bonner thanked me for helping Mr. Thomas with the habeas petition but never told me that she did not file it.

Doc. 225-2 at 2-3 (paragraph enumeration omitted; emphasis added).

Added to this mix, in another unusual turn of events, on August 11, 2017, Ms. Bonner, through her own counsel, filed a motion seeking the Court's permission to file her own memorandum. Doc. 226. She so moves to correct what she perceives to be an incomplete record and to counter the parties' Stipulation. The Court addresses Ms. Bonner's motion at the conclusion of this Order.

### III. Legal Principles

"When a prisoner files for habeas corpus relief outside the one-year limitations period, a district court may still entertain the petition if the petitioner establishes that he is entitled to equitable tolling." Damren v. Florida, 776 F.3d 816, 821 (11th Cir. 2015), cert. denied, 137 S.Ct. 830 (2017). "[E]quitable tolling is an extraordinary remedy 'limited to rare and exceptional circumstances and typically applied sparingly.'" Cadet, 853 F.3d at 1221 (quoting

Hunter v. Ferrell, 587 F.3d 1304, 1308 (11th Cir. 2009)). To warrant the application of this extreme remedy, a petitioner must show "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." Holland, 560 U.S. at 649 (quoting Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005)). "The petitioner has the burden of establishing his entitlement to equitable tolling; his supporting allegations must be specific and not conclusory." Cole v. Warden, Ga. State Prison, 768 F.3d 1150, 1158 (11th Cir. 2014) (citation omitted); see Brown v. Barrow, 512 F.3d 1304, 1307 (11th Cir. 2008) ("[A]n inmate bears a strong burden to show specific facts to support his claim of extraordinary circumstances and due diligence." (citation omitted)).

As instructed by the Eleventh Circuit, this Court has considered Holland, Maples, and Cadet.[20] In Holland, the Supreme Court reaffirmed that AEDPA's one-year limitations period "is subject to equitable tolling in appropriate cases." Holland, 560 U.S. at 645 (citations omitted). It also reiterated "that a garden variety claim of excusable neglect, such as a simple miscalculation that leads a lawyer to miss a filing deadline, does not warrant equitable tolling." Id. at 651-52 (quotations and citations omitted). Yet, the Court recognized that depending on the facts of the case, an attorney's professional misconduct could "amount to egregious behavior and create an extraordinary circumstance that warrants equitable tolling." Id. at 651. And the Court did not foreclose consideration of whether an attorney's misconduct that amounts to bad faith, dishonesty, divided loyalty, or mental impairment reaches the level

---

[20] In Thomas, the Eleventh Circuit cited to the panel opinion in Cadet which was later vacated and replaced by a new opinion. Cadet v. Fla. Dep't of Corr., 853 F.3d 1216 (11th Cir. 2017). This Court has relied upon the 2017 opinion (which is now before the Supreme Court on a petition for writ of certiorari).

of "extraordinary" to warrant equitable tolling. See id. at 652; see also Thomas, 795 F.3d at 1292 ("At the same time, the factors we had identified in Holland I—'bad faith, dishonesty, divided loyalty, [and] mental impairment,' 539 F.3d at 1339[21]—may still serve as extraordinary circumstances that support a claim to equitable tolling.").

Less than two years later, in Maples, the Supreme Court considered whether an attorney's conduct provided "cause" to excuse a procedural default. See Maples, 565 U.S. at 271. Maples was represented by two out-of-state lawyers in his postconviction proceedings, as well as a local lawyer who served as counsel for the sole purpose of allowing the out-of-state lawyers to appear pro hac vice. Id. at 270, 274. Without notice to Maples or the court, and without securing substitute counsel, the out-of-state lawyers left their firm and accepted positions that precluded their continued representation of Maples. Id. at 270-71, 275. While his counsel still appeared on the court's docket, Maples was effectively left without counsel and was unable to timely file an appeal of the denial of his postconviction motion; this eventually resulted in a federal district court determining that his federal habeas claims were procedurally defaulted. Id. at 271, 279. Based on the unique facts of the case, and considering principles of agency law and fundamental fairness, the Supreme Court held that Maples showed "ample cause . . . to excuse the procedural default into which he was trapped when counsel of record abandoned him without a word of warning." Id. at 289.

In 2017, the Eleventh Circuit analyzed the current status of equitable tolling in habeas cases. See Cadet, 853 F.3d at 1216. After discussing the Supreme Court's decisions in

---

[21] Holland v. Florida, 539 F.3d 1334 (11th Cir. 2008), rev'd, 560 U.S. 631 (2010).

Holland and Maples, the Eleventh Circuit ultimately held "that attorney negligence, even gross or egregious negligence, does not by itself qualify as an 'extraordinary circumstance' for purposes of equitable tolling; either abandonment of the attorney-client relationship, such as may have occurred in Holland, or some other professional misconduct or some other extraordinary circumstances is required." Id. at 1227.

## IV. Analysis

The answer to the Eleventh Circuit's question as to why Ms. Bonner untimely filed the habeas Petition is found in the parties' Stipulation: She "deliberately delayed filing the petition in order to use Petitioner's case as a test case to challenge AEDPA's statute of limitations." Doc. 220 at ¶ 7. The Eleventh Circuit contemplated this as one potential reason for the late-filing: "[I]f Bonner deliberately delayed filing the petition in order to use Thomas's case as a test case to challenge AEDPA's statute of limitations, without regard for the possible consequences for Thomas himself, that may indicate divided loyalty or bad faith on her part." Thomas, 795 F.3d at 1295. The Eleventh Circuit did not decide "whether bad faith, dishonesty, divided loyalty, and mental impairment fall under the umbrella of abandonment, or instead amount to independent reasons that equitable tolling may be appropriate in a particular case." Id. at 1294. Rather, the Court noted that "these factors may suggest that Thomas had been effectively abandoned by his attorney, and should not be held responsible for her error, or may otherwise constitute circumstances that are extraordinary and rare enough to warrant equitable tolling. It is enough to say that these factors may still form the basis of an equitable tolling argument." Id. The facts of this case warrant consideration of these factors under the "umbrella of abandonment."

30

## A. Abandonment / Extraordinary Circumstances

In determining abandonment, courts consider the fundamental principles underlying agency law. "[T]he agency relationship between an attorney and his client can be severed, with the result that the client is not constructively charged with his attorney's knowledge or actions when, for example, the attorney actually abandons his client or purposely acts adversely to his client's interests or commits another serious breach of loyalty to his client." Cadet, 853 F.3d at 1229 (citations omitted). "[U]nder fundamental tenets of agency law, a principal is not charged with an agent's actions or knowledge when the agent is acting adversely to the principal's interests." Downs v. McNeil, 520 F.3d 1311, 1320 (11th Cir. 2008) (citations omitted). "The reasoning behind the adverse interest exception is that where an agent, though ostensibly acting in the business of the principal, is really committing a fraud for his own benefit, he is acting outside of the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it." Cadet, 853 F.3d at 1230 (quotations and citation omitted). This exception is narrow and "applies only where an agent wholly disregards the principal's interests in favor of his own interests or the interests of a third party." Id. at 1231 (citation omitted).

Ms. Bonner's pattern of intentional, unconscionable conduct in this case extends well beyond the gross negligence described in Cadet–it reaches into the depths of abandonment. Ms. Bonner's deliberate action of delaying the filing of the Petition was directly contrary to Petitioner's instructions and adverse to his best interests. According to the parties' Stipulation, which this Court has accepted, Ms. Bonner was acting, or in reality failing to act, because "she had developed an interest in challenging the constitutionality of the AEDPA

deadline based on her own belief that the one-year statute of limitations did not allow sufficient time for investigation and preparation of a petition for writ of habeas corpus." Doc. 220 at ¶ 6. She did so without her client's consent or knowledge–indeed, she did so through "willful deceit." <u>Downs</u>, 520 F.3d at 1323. Because she needed "a test case to challenge AEDPA's statute of limitations," Ms. Bonner abandoned her client, destroying his chance at federal review.

The record evidence, including Ms. Bonner's letters to Petitioner and the status reports filed with this Court, supports the parties' Stipulation. Ms. Bonner was dishonest in her letters to Petitioner. And she certainly was disingenuous (at best) in her status reports to this Court regarding her calculation of the one-year limitations period. When Ms. Bonner successfully moved the Court to expeditiously appoint her based on the impending limitations deadline, she led Petitioner and this Court to believe that the filing of the Petition was right around the corner. She never advised the Court that her calculations led her to believe that the one-year limitations period had already expired.[22] It is telling that Ms. Bonner waited almost exactly one year from the date of her court appointment to file the Petition, and then she advised the Court and Petitioner that she intended to challenge the constitutionality of AEDPA's one-year limitations period. The parties' Stipulation and the record evidence, including Petitioner's testimony and Ms. Bonner's own statements, all adds up to Ms. Bonner abdicating her duty of loyalty to her client to promote her own interests in challenging the

_____

[22] Ms. Bonner's lack of candor with the Court is not dispositive to the abandonment analysis but it is certainly relevant in considering the entire context of her representation of Petitioner.

limitations period. She did this by being dishonest with her client and deliberately filing the Petition late. As a result, she "effectively abandoned" him. See Thomas, 795 F.3d at 1294.

Besides stipulating to Ms. Bonner's conduct, Respondents' brief on remand reiterates their long-held position that Ms. Bonner missed the deadline on purpose:

> The Eleventh Circuit remanded this case for this Court to make additional factual findings. Based on the stipulation, this Court should explicitly find Ms. Bonner intentionally missed the deadline as part of her litigation strategy.[]

> There is simply no other reasonable conclusion given her motion to be appointed as habeas counsel on an emergency basis with the stated emergency being the approaching deadline and her failure to file the petition even after this Court prompted her to do so. Thomas v. McDonough, 452 F.Supp.2d 1203 (M.D. Fla. 2006). Bonner asked this court for an appointment as CJA counsel of record on an emergency basis because the deadline for timely filing the habeas petition was fast approaching. Thomas v. McNeil, 3:03-CV-237-J-32, 2009 WL 9081403, at *5 (M.D. Fla. 2009) (detailing Ms. Bonner's request for appointment on an emergency basis due to the impending habeas deadline and observing: "Based on Ms. Bonner's statements of the urgent timing, the Court expected a petition to be filed almost immediately" but "nothing happened" despite this court's repeated orders for status reports). At the first oral argument, Bonner openly admitted that "she intended to rely on equitable tolling as a basis to have her petition declared timely." Thomas v. McNeil, 3:03-CV-237-J-32, 2009 WL 9081403, at *6 (M.D. Fla. 2009).

> The timing of her request for appointment and her subsequent non-actions speak for themselves and establish that Bonner missed the deadline on purpose. Bonner did not file the petition even after prompting from this Court. And then she asked for permission to file a habeas petition when no permission is required as she no doubt was aware from her other federal habeas cases and permission is certainly not required in a case when the Court is urging counsel to file the petition.

Furthermore, the timing of her filing the actual habeas petition, which was approximately one year from the date of her appointment, was designed to support her argument that the statute of limitation should be equitabl[y] tolled to allow new counsel a full year to investigate. The timing of the actual filing establishes the intentional[] nature of missing the deadline.

Nor was this the only case where Bonner played games with the federal courts. Bonner missed the deadline in the companion case of <u>Asay</u> and intentionally omitted a claim in [an]other capital case. <u>Franqui v. Florida</u>, 638 F.3d 1368 (11th Cir. 2011) (holding Bonner's omission of a claim from petition after repeatedly promising prisoner that it would be included that petition[er] believed was a "particularly strong" claim did not result in defect in integrity of federal habeas proceedings). <u>This Court should explicitly find Ms. Bonner intentionally missed the deadline as part of her litigation strategy.</u>

Doc. 233 a 3-5 (emphasis added).

At a hearing held on July 25, 2016, the Court pointed out to Respondents the passage from the Eleventh Circuit's remand opinion that said, "[I]f Bonner deliberately delayed filing the petition in order to use Thomas's case as a test case to challenge AEDPA's statute of limitations, without regard for the possible consequences for Thomas himself, that may indicate divided loyalty or bad faith on her part." Doc. 234 at 36. Respondents' counsel responded:

I am going to fight tooth and nail with [the Eleventh Circuit] when I get up there. . . . I don't think they're holding that that is divided loyalty or bad faith. If they are, I'm going to appeal them even higher.

So, Your Honor, I am willing -- I'm not going to change my position. I think the facts are the facts. And I - - I believe that's what went on. And I've always believed that. And I'm not going to start backpedalling. If they end up finding that, so be it.

But that's what really happened here. And I'm not going to pretend something else happened here. And I will fight with the Eleventh Circuit about their view of bad faith.

And, Your Honor, I wrote a memo to you on remand. I did not write that all to them. They [(the Eleventh Circuit)] have not been briefed. They have not heard how I think you cannot possibly find - - now, Your Honor, I personally think it was rather bad faith to Your Honor, but it was not divided loyalty or bad faith to her client. And it must be to her client.

Was she playing pretty fast and loose with the court? Yes, she was. But that's not abandonment. You must abandon your client. That's nowhere near it.

. . . .

So I will - - I will eat that if that's . . . I'll deal with the Eleventh Circuit, Your Honor.

I know they said that. I very much picked up on that. But . . . I think the facts are the facts. And I'm not going to pretend they're something else. If they really find that based on those facts, well, then that's fine.

Id. at 36-37.

In their supplemental brief, Respondents agree that Ms. Bonner "acted fraudulently, with deceit and by unfair means to gain the advantage of delay," Doc. 233 at 7 (quotations omitted), but they argue that "equity requires clean hands [and] Bonner's hands are not." Doc. 233 at 6; see also Doc. 181 at 5. But that is precisely the point: when a lawyer's intentional and deceitful acts result in the abandonment of the client, the client, in equity and good conscience, should not be prejudiced. See Maples, 565 U.S. at 283 ("[U]nder agency principles, a client cannot be charged with the acts or omissions of an attorney who has abandoned him. Nor can a client be faulted for failing to act on his own behalf when he lacks reason to believe his attorneys of record, in fact, are not representing him."); see also

<u>Downs</u>, 520 F.3d at 1321 ("The rule that a petitioner must always bear the consequences of his attorney's misconduct is unequivocal–yet bright-light rules do not govern the court's exercise of its equitable powers.").

Respondents also argue that Petitioner's approval of his attorney's litigation strategy is not required. The Court finds this argument unavailing. While it is true in some situations that a client's approval is not required, this is different. Ms. Bonner's intentional decision to miss the deadline was made without Petitioner's knowledge (and contrary to what she led him to believe), was directly contrary to his instructions, and was unquestionably adverse to his interests.

This case is different from <u>Maples</u>, where the attorneys ceased their representation of the petitioner without notice to him or the court, inasmuch as Ms. Bonner continued to communicate with Petitioner and the Court. However, that she did so does not preclude a finding that she "effectively abandoned" him. <u>See</u> <u>Thomas</u>, 795 F.3d at 1294. The focus remains on whether her interests were adverse to Petitioner's. Without a doubt, they were. What places Ms. Bonner's conduct in the same realm as Maples' attorneys is her dishonesty and willful deceit regarding (1) when she would file the petition; (2) her intentions in deliberately delaying the filing of the petition; and (3) her failure to file the petition in April 2003 after Petitioner signed it (and having no explanation for then being able to file the petition with Petitioner's April 2003 signature date almost exactly one year after her appointment in March 2004).[23] Having now had the opportunity to observe Ms. Bonner's and

_____

[23] When asked whether she received the signed petition from Petitioner in 2003, she testified, "I don't know. I do not." Doc. 84 at 143. She later stated, "All I can think with this is that - - and this would be consistent with my practice, that I did fill this out, that I took it to

Petitioner's testimony and consider the record evidence, including Petitioner's affidavit, the Court credits Petitioner's testimony and sworn statements that he sent the signed petition to Ms. Bonner in April 2003 expecting it to be filed soon after; that he had no reason to believe Ms. Bonner would not follow his instructions to timely file the petition; that he, in fact, believed she had filed it; that given his imprisonment on death row, he had to rely on Ms. Bonner for updates in his case; and that he would have taken additional action had he known she did not file the petition in April 2003.[24]

Considering the entire record, the Court finds that Ms. Bonner was dishonest with her client, and she acted in bad faith and with divided loyalty. Her intentions were her own–which were contrary to Petitioner's interests. Thus, Petitioner has shown extraordinary circumstances, because Ms. Bonner's bad faith, dishonesty, and divided loyalty resulted in her "effectively abandoning" her client.

### B. Petitioner's Diligence

Death-row inmates, by nature of their circumstances, are limited in their abilities to represent themselves. As this Court previously observed: "If capital petitioners were able to navigate the shoals of federal habeas litigation without assistance, there would be no need to appoint counsel in the first place. Yet, federal law provides for appointment and payment

---

him, or mailed it to him, and he signed it, and after the interview with him, where he sent me on multiple roads, . . . I could not file it because I could not get it complete. There were things he was saying which were of such magnitude that it required exploration of those." Id. at 147.

[24] Respondents' concern that this case will set a precedent which will allow "[t]he capital bar [to] recruit attorney[s] nearing retirement to act as federal habeas counsel who would intentionally miss the deadline," is cynical, unfounded and speculative. Doc. 233 at 20-21. This Court is considering only Ms. Bonner's actions in representing Petitioner in this case. The alleged conduct of other attorneys discussed in Respondents' brief is of no import here.

of counsel in federal habeas capital cases, thereby acknowledging the necessity of such counsel." Doc. 42 at 3. Nevertheless, death-row inmates, such as Petitioner, are required to exercise "reasonable diligence" in pursuing their habeas rights, but they are not required to show "maximum feasible diligence." Holland, 560 U.S. at 653 (quotations and citations omitted).

Petitioner was proactive during his state court postconviction proceedings and was ultimately successful in obtaining federal habeas counsel before the expiration of his one-year limitations period.[25] Ms. Bonner, in her initial communication with Petitioner,[26] advised him of her experience and attached her resume. Doc. 102 at 27-31. Petitioner actively communicated with Ms. Bonner–Ms. Bonner acknowledged on January 21, 2003; March 19, 2003; April 15, 2003; and June 4, 2003, that she received letters from Petitioner, all before the expiration of his one-year limitations period. Doc. 102 at 4, 10, 21, 22. Prior to the AEDPA deadline and after Ms. Bonner had been appointed to represent him, he sent Ms. Bonner a completed, signed petition for filing. See Doc. 84 at 105-07, 109. Trusting his experienced counsel, Petitioner did not have reason to believe that she would fail to timely file his petition. This is especially so given her letters, which sent a message to Petitioner that she was competently handling his case. See id. at 98-99, 110, 114, 115. And in fact, her deception dissuaded Petitioner from doing more on his own. See Doc. 225-1 at 6 ("I can say without hesitation that had Ms. Bonner ever told me that she had failed to follow my

_____

[25] Petitioner testified that he had another attorney who agreed to take his case, but Petitioner "didn't go to him, because Ms. Bonner accepted the position." Doc. 84 at 96.

[26] There may have been more, but this is the initial communication found in the record. See Doc. 84 at 91.

directions to file the habeas petition back in April 2003, I would have immediately prepared another habeas petition and filed it myself in advance of the June 2003 deadline.").

Ms. Bonner did not advise Petitioner of her plan to intentionally miss the AEDPA limitations deadline. <u>See</u> Doc. 84 at 115-17; <u>see also</u> Doc. 84 at 150 (Ms. Bonner confirmed that it was her decision to wait to file a petition until she completed her investigation), 155-57. Additionally, Petitioner did not know that Ms. Bonner failed to file the petition he had signed in April 2003, until he received a copy of this Court's Order entered on September 25, 2006. Doc. 225-1 at 5; Doc. 84 at 116-17, 127.

On May 4, 2007, Petitioner wrote a letter to the undersigned which reviewed the history of his efforts to timely file his Petition. Doc. 196. By that time, the Court had belatedly realized what a disaster Ms. Bonner's appointment had been and had appointed Mr. Mills as co-counsel to represent Petitioner. Petitioner explained in the letter:

> I have struggled to grasp what it means to be time-barred and with the issue of tolling in general, mainly because Ms. Bonner had led me to believe the time issue was a technical matter which could be "cured at a later date." Moreover, she did not inform me that I lost my right to habeas review. Her indication was that the time bar issue concerned secondary issues "previous counsel" failed to raise at the state level, "prior" to my habeas proceedings. Also, as it concerns your ruling, I find no mention of the habeas corpus form Ms. Bonner instructed me to fill out, which I returned to Ms. Bonner.
>
> I simply do not have a mind for the law but something seems off here. On March 25 / 26, 2003 I completed a blank habeas corpus petition, repeating all the issues raised at the state court level. The blank petition was sent with instructions by Ms. Bonner. On 19 March 2003, she told me to complete the forms and affidavit of indigency, have them notarized and returned to her.

I have Ms. Bonner's letters explaining how to fill out each. The notary records are maintained by the prison, and importantly, in this Court[']s 21 April 2003 Order, at note 3, the Court explains that Ms. Bonner claims to have "just received the documentation," and Ms. Bonner informed me that the petition had been placed before the Court.

Yet, in reading the Court[']s ruling discussing the time-bar issue, I find no mention of this petition as part of the Court[']s review–did the Court dismiss it as improper, or did Ms. Bonner lie to me, failing to file anything. And if so, were Ms. Bonner's action[s] intentional as several guys here who know her claim that she is trying to create a constitutional crisis. Evidently all her death sentenced prisoner[s] face time-bar claims. Figuring I can only assume that the Court will not want to execute large numbers of prisoners without benefit of federal review.

For me, having provided the completed habeas petition to Ms. Bonner, I thought all the time issues concerned additional filings not presented in the state court or supplemental filings[,] a belief based in Ms. Bonner's letters to me. I did not know it meant no habeas review at all.

In trying to understand it all, I was informed by legal services here at the prison, that Mr. Mills needs to file a Rule 60 motion, as the Court[']s decision does not take into consideration "diligence" on my part in filling out a habeas petition before April 2003, and my belief that it had been filed by Ms. Bonner. And afterwards, how she had hid the truth from me, representing to me in letters that the time issue we were fighting w[as] preexisting her appointment and even so, they were only technical matters which could be cured at a lat[]er date.

Had I known differently, I would have filled out a second petition form and mailed to this Court. Either Ms. Bonner is completely incompetent or her actions in failing to file the petition I sent her were intentional to create a constitutional fight. Certainly, my actions with her intentional decei[]t would be grounds for tolling.

Doc. 196 (some capitalization omitted; internal formatting modified).

Contrary to Respondents' contention, Petitioner had no reason to immediately write a letter such as this to this Court when Ms. Bonner told him on April 15, 2003, albeit incorrectly, that his AEDPA deadline passed before his Rule 3.851 motion was filed in state court, which was long before she became involved in his case. Petitioner testified that he realized at some point that Ms. Bonner had lied to him. While in hindsight it is easier to dissect Ms. Bonner's letters, especially now knowing her true intention in delaying the filing of the petition, her letters left Petitioner with the impression that she was still competently representing him and "that the time issues were technical . . . and they could be dealt with later. So [he] assumed there was something that [he] didn't know." Doc. 84 at 126. He also thought that Ms. Bonner had filed his signed Petition in April 2003.

In <u>Downs</u>, the petitioner alleged that he "wrote to three CCRC attorneys to express concern over the running of the AEDPA filing period and to urge the filing of his federal habeas petition or an additional state court pleading" and that he "attempted to assist his attorneys in drafting his federal petition by providing them with either a draft petition or a list of issues to be included in the petition." <u>Downs</u>, 520 F.3d at 1323. The Eleventh Circuit determined that these allegations, if true, "establish that [the petitioner] acted with due diligence to ensure his petition would be timely filed." <u>Id.</u> Similarly, Petitioner actively communicated with Ms. Bonner and sent her a completed and signed petition before the AEDPA deadline expired, with instructions to file it on his behalf. Petitioner was under the impression that Ms. Bonner would follow his instructions.[27] See <u>Dillon v. Conway</u>, 642 F.3d

_____

[27] This case is unlike <u>Holland</u>, 560 U.S. at 653, where the petitioner prepared a pro se petition and promptly filed it "the very day that [he] discovered that his AEDPA clock had expired," because Petitioner believed his April 2003 petition had been filed before his

358, 363-64 (2d Cir. 2011) (applying equitable tolling when a petitioner "relied on his counsel's assurances that the petition would be filed prior to the deadline"). Regardless of whether in hindsight it can be said that there was more Petitioner could have done, the standard is reasonable diligence. And considering the totality of the circumstances, the Court finds Petitioner has shown he was reasonably diligent.

## V. Conclusion on Equitable Tolling

Under both Supreme Court and Eleventh Circuit precedent, equitable tolling is rarely appropriate. Yet "rarely" does not mean "never."

> In emphasizing the need for flexibility, for avoiding mechanical rules, we have followed a tradition in which courts of equity have sought to relieve hardships which, from time to time, arise from a hard and fast adherence to more absolute legal rules, which, if strictly applied, threaten the evils of archaic rigidity. The flexibility inherent in equitable procedure enables courts to meet new situations [that] demand equitable intervention, and to accord all the relief necessary to correct . . . particular injustices. Taken together, these cases recognize that courts of equity can and do draw upon decisions made in other similar cases for guidance. Such courts exercise judgment in light of prior precedent, but with awareness of the fact that specific circumstances, often hard to predict in advance, could warrant special treatment in an appropriate case.

Holland, 560 U.S. at 650 (quotations and citations omitted). This is such an appropriate case. Considering the parties' Stipulation and the entire record, being intimately familiar with the facts of this case, and having had the opportunity to witness first-hand Petitioner's and Ms. Bonner's testimony, this Court determines that Petitioner has demonstrated entitlement to equitable tolling. Selecting the period of equitable tolling is difficult. However, the Court

---

AEDPA period expired.

42

determines equitable tolling began in April 2003 (about two months before the June 18, 2003 limitations deadline) when Petitioner had every right to assume that Ms. Bonner had filed his Petition through March 22, 2004 when the Petition was filed. Thus, the Petition (which this Court has already decided on the merits) is deemed timely filed.

## VI. Ms. Bonner's Motion

Ms. Bonner is attempting to intervene in this case because she disagrees with the parties' Stipulation. At this point, Ms. Bonner is merely a witness. Her request to intervene is not accompanied by a memorandum of law, and she has failed to explain her standing to intervene. She asserts that Petitioner's current counsel is withholding information from this Court regarding her medical condition, but the depositions of Drs. Groene and Steiman were filed under seal on March 9, 2017. Doc. S-217. Despite the parties' Stipulation, the Court has reviewed the depositions and finds there is no basis to allow Ms. Bonner to intervene to take a position that would be in conflict with her former client. Her motion is due to be denied.

## VII. Postscript

This Court, faced with an urgent request to appoint Ms. Bonner, which was supported by Petitioner, and seeing that she had prior capital postconviction experience, made the fateful decision to appoint her. It is a decision I came to regret, not only in this case but also in another capital case where Ms. Bonner filed the petition late. See Thomas v. McNeil, No. 3:03-CV-237-J-32, 2009 WL 9081403, at *10-15 (M.D. Fla. Feb. 10, 2009) (addressing Mark James Asay's entitlement to equitable tolling after Ms. Bonner failed to timely file his habeas petition). Partially because of Ms. Bonner's misconduct in representing Petitioner, Ms. Bonner came under investigation by the Florida Supreme Court–which investigation was only

43

dropped when she resigned from the Capital Collateral Attorney Registry. Doc. 209; In Re: Mary Catherine Bonner, No. AOSC17-13 (administrative order dated Feb. 9, 2017).

In large part because of the Court's experience with Ms. Bonner and other similar cases, and encouraged by the Eleventh Circuit in Lugo v. Secretary, Florida Department of Corrections, 750 F.3d 1198, 1215 (11th Cir. 2014), to employ a Capital Habeas Unit (CHU) to ensure proper representation of federal capital habeas petitioners, the Middle District of Florida has now established a CHU, effective October 1, 2018. Let there be no future cases like this one.

It is

**ORDERED**:

1.     The Court finds that Petitioner is entitled to equitable tolling such that his Petition for Writ of Habeas Corpus (Doc. 12), filed on March 22, 2004, is deemed timely filed.

2.     Ms. Bonner's Motion for Leave to File Memorandum (Doc. 226) is **DENIED**.

3.     The Clerk shall immediately transmit a copy of this Order to the Eleventh Circuit and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 6th day of February, 2018.


TIMOTHY J. CORRIGAN
United States District Judge

JAX-3 2/5
c:
William Gregory Thomas, #311509
Counsel of Record
USCA